**NELSON et al. v. UNITED STATES.**

No. 12281.

Circuit Court of Appeals, Eighth Circuit.

Oct. 30, 1942.

WOODROUGH, Circuit Judge, dissenting.

John W. Windhorst, of Minneapolis, Minn. (Leland W. Scott, of Minneapolis, Minn., on the brief), for appellants.

Mamie S. Price, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Gerald L. Wallace, and S. Dee Hanson, Sp. Assts. to Atty. Gen., and Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., on the brief), for appellee.

Before GARDNER, WOODROUGH, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

The question presented on this appeal is whether the appellant taxpayers are entitled, under § 23(e) (2) of the Revenue Act of 1934, 48 Stat. 680, c. 277, 26 U.S.C.A. Int.Rev.Acts, page 672, to a deduction from their joint gross income tax for the taxable year 1935 for a claimed loss due to worthlessness of shares of common stock owned by one of the taxpayers. By the section of the Revenue Act involved here, deductions by individuals from gross income are allowed for losses sustained during the taxable year and, by treasury regulations promulgated under the act, it is provided that such losses must in general be evidenced by "closed and completed transactions fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed". U. S. Treas. Reg. 86, Art. 23(e)–1. Losses due to the worthlessness of shares of a corporation are deductible "for the taxable year in which the stock became worthless, provided a satisfactory showing is made of its worthlessness". U. S. Treas. Reg. 86, Art. 23(e)–4. By stipulation of the parties it was agreed that the stock involved in this case was, in fact, worthless in the year 1935, and was not worthless prior to the year 1932. The narrow question for decision, therefore, is whether the taxpayer's stock became worthless in the year 1935.

 The question is one of fact controlled by the evidence in this particular case. Rassieur v. Commissioner of Internal Revenue, 8 Cir., 129 F.2d 820. But certain principles applicable to all cases of this character may be adduced from the authorities. "Generally speaking, the income tax law is concerned only with realized losses, as with realized gains." Lucas v. American Code Co., Inc., 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538, 67 A.L.R. 1010. "A real loss is sustained only when all chances or possibilities of collection have been effectively destroyed." Jones v. Commissioner of Internal Revenue, 9 Cir., 103 F.2d 681, 684, 685. "Partial losses are not allowable as deductions from gross income so long as the stock has a value and has not been disposed of." Dresser et al. v. United States, 55 F.2d 499, 512, 74 Ct.Cl. 55; Dunbar v. Commissioner of Internal Revenue, 7 Cir., 119 F.2d 367, 135 A.L.R. 1424. In the case of a loss claimed because of the worthlessness of common stock of a corporation, actual worthlessness is the test. That the shares of stock may be worthless on a liquidation is not decisive of the question. The common stock of a corporation has no value when its assets, fairly appraised, are less than its liabilities unless, in such case, there is a prospect of improved conditions which will bring about the reverse. In the circumstances last mentioned, the stock has a potential value and no loss for income tax purposes is realized by the owner until that potential value has disappeared. Rassieur v. Commissioner of Internal Revenue, supra; Thompson v. Commissioner of Internal Revenue, 2 Cir., 115 F.2d 661; Burnet v. Imperial Elevator Company, 8 Cir., 66 F.2d 643; Olds & Whipple v. Commissioner of Internal Revenue, 2 Cir., 75 F.2d 272, 275.

██ ██ "The right to claim a deduction is a statutory privilege * * * and the burden of proving losses within the statute rests upon the taxpayer." Jones v. Commissioner, supra. Generally a taxpayer must prove some identifiable event which determines the time of actual loss. "This may be a single event or a series; and occurs usually when the property in question is sold or disposed of or its value otherwise extinguished." Jones v. Commissioner, supra. But "The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test." Lucas v. American Code Co., supra. It has been said that this burden of proof is a difficult one at best and that the taxpayer should not be held to hard and fast technical rules in determining the precise time in which the loss occurred. Dunbar v. Commissioner of Internal Revenue, supra. Neither the existence of a balance sheet of the corporation showing no equity for the stockholders, nor the appointment of a receiver, the appointment of a trustee in reorganization proceedings, nor the adoption of a resolution by the

board of directors of a corporation providing for the liquidation is decisive upon the question of the worthlessness of stock where the evidence also establishes the existence of a potential value which may be realized on liquidation or through continuation of business. Mahler v. Commissioner of Internal Revenue, 2 Cir., 119 F.2d 869; A. R. Jones Oil & O. Co. v. Commissioner of Internal Revenue, 10 Cir., 114 F.2d 642, 646.

A consideration of the evidence in this case in the light of the authorities quoted above impels the conclusion that the district court erred in its finding that the stock involved in this case became worthless prior to the year 1935. There is no dispute as to the evidence, but only as to the inferences and conclusions reasonably to be drawn from admitted facts. The evidence consists of a stipulation of facts and the uncontradicted testimony of two witnesses on behalf of the appellant taxpayers.

From the stipulation of facts and the testimony on behalf of the appellants, it appears that prior to 1932, Lane, Piper & Jaffray, Inc., shares in which are involved here, was engaged in the investment banking business. The company operated as the originator, purchaser at wholesale, and retailer of securities, and at times its business required large loans from banks. As a result of the severe depression which began in October 1929, the company found itself without a market for the securities held by it, some of which it had originated or purchased at wholesale, and for this reason it was unable promptly to meet its outstanding bank loans. In September 1931, the severity of the panic in the securities market increasing, the banks required the principal stockholders of the company, who had always guaranteed the payment of its debts, to provide additional collateral in support of the bank loans, which they did from their personal holdings. And, because it was not possible for the company to dispose of its investments at anything-like their cost, no market existing, it was compelled, in December 1931, to quit its investment banking business. It continued, however, throughout the years 1932–35 to buy and sell securities on the market, and during these years the company also endeavored to realize as much as possible from the securities held by it as of December 31, 1931.

Through the purchase and sale of securities during the years 1932–35, the company made a net profit of $420,402.58 on securities purchased during those years at a cost of $1,535,791.65. It is admitted in the stipulation of facts that the company did not cease all of the business in which it was authorized to engage in any of the years mentioned but, on the other hand, was actually engaged in all operations which it was able to continue in view of the depression.

The books of the company reflected as of December 31 for the years 1931–35 a deficit for both common and preferred stock. Prior to January 1, 1932, the books of the corporation were kept on the basis of inventory of securities and this inventory was set up at cost or market price, whichever was lower. After December 31, 1931, the Commissioner of Internal Revenue required the corporation to carry its securities at cost until they were actually sold or became worthless, regardless of fluctuations in the market value. The officers of the corporation, although complying with the requirements of the Commissioner, also kept duplicate records upon the books of the company in form as in 1931. The following table shows the deficit of the corporation with respect to stock, according to both systems of accounting for the years 1931–34:

| Date | Books | Income Tax |
|---|---|---|
| December 31, 1931 | $ 136,526.97 | $136,526.97 |
| December 31, 1932 | 1,264,580.21 | 265,701.20 |
| December 31, 1933 | 1,172,456.92 | 363,520.51 |
| December 31, 1934 | 714,186.93 | 717,091.28 |

A comparison of the two statements will indicate the vast difference between the cost and the market value of the securities held by the corporation.

A forced liquidation of the company in any of the years shown would have resulted in complete loss to the owners of the corporation. But liquidation did not take place until the fall of 1935, when it was compelled by the demands of the banks to which the company was indebted. It resulted in a discharge of all of the obligations of the company except approximately $27,000 owing to the United States for income taxes. The loss of the owners of the stock was then actually realized.

This conclusion is borne out by the testimony of two qualified witnesses, uncontradicted in the record. Both testified that the stock in question did not actually become worthless until the liquidation of the company had occurred in 1935, having· in

**304**

their opinion as experienced investment bankers, at all times prior to liquidation, a real potential value. Their testimony was to the effect that the depression which struck the country in the fall of 1929 destroyed the market value of securities held by the corporation, with the result that the price at which the owner of a security could dispose of it was in most instances lower than the admitted intrinsic value of the security. Value remained though the market vanished. There was a complete absence of confidence in the business world and this condition, which began in 1929, became progressively worse until the spring of 1933, after which there was a steadily rising market with notable and pronounced improvement throughout the succeeding years and a marked upsurge through 1936 into the spring of 1937. Both witnesses agreed that if the corporation had been permitted to continue its operation through the year 1936, the stockholders would have realized a substantial, if not a full return, upon the value of their investments. Their testimony is supported by the facts revealed in the following tables showing the change in the situation between the years 1932 and 1937. In the first table are set forth some of the stocks owned by Lane, Piper & Jaffray, Inc., in 1932 showing book value as of 1932 in comparison with prices actually later received. In the second table are shown quotations on some of the securities in which the corporation dealt during 1935, with comparative market values as of 1935 and as of 1936–37.

Table I

| Security | Book Value December 31, 1932 | Actual Sale Price |
|---|---|---|
| American Beet Sugar | $ 250.00 | $ 4,000.00 |
| Greyhound common | 9,800.00 | 45,000.00 |
| Greyhound, participating preferred | 3,000.00 | 35,000.00 |
| Minneapolis Honeywell | 13,000.00 | 46,000.00 |
| Minneapolis Moline pfd. | 4,000.00 | 41,000.00 |
| Truax-Traer Coal common | 6,300.00 | 50,000.00 |
| Truax-Traer bonds | 21,000.00 | 74,000.00 |

Table II

| Security | November 1935 Value | November 1936 to March 1937 value |
|---|---|---|
| Chrysler | 89 | 138 |
| Great Northern Ore | 14 | 22 |
| Great Northern Railway | 31 | 46–56 |
| Kennecott Copper | 28 | 63–69 |
| Lynch Corporation | 38 | 55½ |
| Phelps-Dodge | 25 | 56 |
| Montgomery-Ward | 38 | 63 |
| United States Steel | 50 | 126 |

It further appears in the evidence that securities which the company sold in the years 1932–35 for a total of $619,090.41 would have produced $1,568,442.75 had they been retained until 1936 or 1937. This additional net profit would have more than equaled the face value of the outstanding stock of the corporation, common and preferred. The actual realization from sales of securities held in 1932 and sold during and prior to liquidation was greater by $711,000 than the book value shown by the company's statements in December 1932. The witnesses agreed that the potential value of the stock was always apparent to those competent to judge the situation of the company, and that the effort of the officers to continue its business with the hope of saving the investment of the stockholders was based upon sound reason.

The district court was of the opinion that the financial crisis which broke upon the country in October 1929, the subsequent inability of the corporation to find a market for its securities at anywhere near cost, its large indebtedness to banks, the discontinuance of the investment banking business in 1931, the fact that the corporation showed a deficit for common stock on December 31, 1932, together with the bank holiday throughout the country in March 1933, were identifiable events which made inevitable the conclusion that the stock became worthless prior to January 1, 1935. But of these so-called identifiable events upon which the court based its findings, four occurred before January 1, 1932, and the parties here have stipulated that the stock did not become worthless prior to that date. This stipulation is binding upon both the court and the parties. Iowa Bridge Co. v. Commissioner of Internal Revenue, 8 Cir., 39 F.2d 777. Nor is there any evidence in the record to indicate that the bank holiday in 1933 measurably affected the value of the stock in question. On the contrary, it appears in the record that the Commissioner had previously denied the claim of a loss from another stockholder of the corporation for the year 1933. The sole identifiable event of significance among those pointed out by the district court is the fact that the financial statement of the company as of December 31, 1932, showed a deficit with respect to both common and preferred stock. But as we have said, this alone is not decisive of the question, es-

pecially in cases in which the corporation continues in business and steadily improves its position, as was the case here. The trial court singled out one of a series of events which culminated in 1935 in a closed and completed transaction, the liquidation of the corporation and the loss claimed by the taxpayer. But only one event of a related series cannot alone fix the time of the loss. The position of the court and of the appellee in this case would compel liquidations at a time most unfavorable to the taxpayer and most disastrous to the business world.

We are of the opinion that the holders of the stock in Lane, Piper & Jaffray, Inc., were justified in their belief that the stock in that corporation had a potential value until the corporation was forced to liquidate. The condition of the corporation did, in fact, improve throughout the years in question. Those in control of it did not suspend business operations. On the contrary, they continued actively all of the business of the corporation which it was able to conduct in view of the prevailing business conditions, realizing a substantial profit out of operations on which the corporation paid federal income taxes. It is not denied that through 1933–35 there was a rising market for securities nor that in the year 1936 the appreciation in the market value of securities held by the corporation and the improvement in the securities market in general was so rapid and so strong that, but for the calling of the bank loans, the stockholders had every reasonable prospect of a restoration of its financial structure and the recovery of the full value of their investments.

The evidence does not sustain the inferences and conclusions drawn by the district court from the admitted facts and, accordingly, the judgment is reversed and the case is remanded with directions to enter judgment consistent therewith.

WOODROUGH, Circuit Judge (dissenting).

As stated in the majority opinion, the question in this case is one of fact, and it seems to me this court has simply substituted its own inferences from ambiguous and inconclusive circumstances for the finding of the fact made by the trial court. Such is not the function of the appellate court, as I understand it, and though the tax is small the principle is of great importance and I dissent on the one ground only.

There was no demonstrative evidence that the taxpayer's stock in Lane, Piper and Jaffray, Inc., had any potential value after December, 1931, and the company was admittedly always insolvent long before, after and on that date. It owed great sums to the banks and they required certain stockholders who were already personally liable for the company's debts to deposit their own securities as collateral to the obligations.

After the company failed to open for business at the beginning of the year 1932, those who had made the pledges with the banks carried on in the office of their new company (bearing two of the same distinguished names) until by the gains from their work and some advances in the stock market the old company's assets sufficed to satisfy the banks and enable the owners to recover their pledges. When that was accomplished the old company was closed out and dissolved as far as could be done with unpaid debts still outstanding. It seems obvious to me that if what was done was what the banks and the pledgors intended to do, there was never any chance for stockholders of the old company like the plaintiff. There was nothing to indicate any intention contrary to what was done. Both Mr. Piper and Mr. Jaffray made dollar sales of their stock in Lane, Piper and Jaffray, Inc., and claimed a loss long before 1935, and there is no intimation of anything improper about the course taken. But the testimony in the case concerning stock market fluctuations that occurred and the opinions of the taxpayer and his expert about the future of the market (to which this court gives weight and the judge who saw and heard the witnesses did not) were not, and in the situation presented could not be demonstrative of the ultimate issue.

I did on reading the record, form an opinion on that issue in accord with the Commissioner and the trial court. But I attach no importance to my opinion. It merely reflects that minds will differ on this record. As to identifiable events, I think the investment bank's closure of its door to the public on the first of the year 1932 was an identifiable event, rather than its decision to close arrived at in 1931. Though the last straw breaks the camel's back, minds will differ about which straw.

Fortunately the tax commissioner looks to the tax year rather than to the moment of breakage, and his allocation of the loss to 1932 had substantial support, as did the trial court's finding that it occurred prior to 1935.