JAMES W. TIPPEN AND BILLIE R. TIPPIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tippin v. Commissioner
Docket No. 3096-84.
United States Tax Court
T.C. Memo 1988-284; 1988 Tax Ct. Memo LEXIS 302; 55 T.C.M. (CCH) 1177; T.C.M. (RIA) 88284; June 28, 1988. James W. Tippin, pro se. Frank M. Schuler and Michael L. Boman, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent *304 determined a deficiency in petitioners' Federal income tax for the year 1980 in the amount of $ 699.83. After concessions [1] the prinicipal issue for decision is whether petitioners' stock in Action Domestic, Inc. became worthless within the meaning of section 165(g) [2] in 1980. If so, there are subsidiary issues as to the amount of the deductible loss that year. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached *305 thereto are incorporated herein by this reference. Petitioners, James W. and Billie R. Tippin, are husband and wife who resided at 2001 West 120th Terrace, Leawood, Kansas at the time of the filing of the petition. Petitioners filed a timely joint Federal income tax return for the taxable year 1980 on June 17, 1981, with the Austin Service Center. From 1965 through 1978, Mrs. Tippin was employed as a teacher by the Kansas City, Missouri Board of Education. Mrs. Tippin received a masters degree in 1974 and an educational specialist degree in 1978. In 1979 she took a one-year leave of absence from her employment with the Kansas City Board of Education. During 1979 and until August of 1980, Mrs. Tippin sold real estate. In August of 1980 Mrs. Tippin began working for Blue Hills Homes Corporation in Kansas City, Missouri as an instructional supervisor, directing 15 to 25 teachers and teachers' assistants. During 1980 Mrs. Tippin also worked for the Kansas City, Missouri School District. Mr. Tippin is an attorney. He worked for the Internal Revenue Service until 1976 when he left to go into private practice. Mr. Tippin has been in private practice from 1976 *306 up to the present time. In 1969 or 1970, before Mr. Tippin became a lawyer, petitioners prepared a business proposal and handbook for a team maid service under the heading "Action Domestic Services, Inc." Action Domestic Services, Inc. was never incorporated but was merely a proposal for a corporation. The proposal for the team maid service stated that its objective was "a solid return on the capital invested for the benefit of the principals." The idea behind the team maid service proposal was that a team consisting of two or three people, with one of these people supervising the others, would be more efficient at cleaning several apartment units in a single building than one person working separately in each unit. The proposal for the team maid service was prepared by Mr. Tippin, apparently in a form designed to try to obtain a grant or financial assistance from the Small Business Administration or some financial institution. The handbook or training manual was prepared by Mrs. Tippin. The handbook describes the proper way for a person to clean various areas and items in a home. The proposal contains objectives for a team maid service, positions that would be available, *307 training techniques, marketing approaches, initial start-up costs, a market survey questionnaire, a list of assets needed, and a projected profit and loss statement. From 1970 to 1972, petitioners tried, without success, to secure financing for the team maid service. The listed necessary assets were never purchased, and petitioners never hired any employees for the team maid service. Petitioners made projections as to income in 1970, but did not make any further projections in later years. After their initial attempt in the early seventies to obtain financing, petitioners did not thereafter do or consider doing any market research for a team maid service. On January 4, 1972, petitioners, with the assistance of an attorney, [3] incorporated Action Domestic, Inc. as a Missouri corporation. At the time of incorporation, petitioners purchased 100 shares of stock at a total cost of $ 1,500, and became the sole equal shareholders of the corporation. Petitioners were elected as the directors of the corporation, along with James M. Reed, at the first meeting of the incorporators of Action Domestic, Inc. At this or at any subsequent corporation meetings, no reference was made to the *308 team maid service or to Action Domestic Services, Inc. [4] In addition, the costs incurred in preparing the team maid service handbook and proposal were never transferred to Action Domestic, Inc. At the first board of directors' meeting on January 22, 1972, petitioners became the sole officers of Action Domestic, Inc. At that meeting, the corporation agreed to purchase the goodwill and all of the assets of a laundromat operated at 2631 Holmes, Kansas City, Missouri, from Walter and Elizabeth Meiner for $ 3,200. The corporation also agreed to pay $ 2,237 to Julian Construction Co. *309 for the remodeling and redecorating of the laundromat. The corporation then entered into a four-year lease with Joseph Brugaletta and Anthony Rustici for the first floor of building number 2631 Holmes, Kansas City, Missouri, where the laundromat was located. At this same board of directors' meeting on January 22, 1972, the corporation agreed to try to finance the purchase and remodeling of the laundromat by issuing stock and obtaining a loan. The corporation decided to offer for sale 1,000 shares of common stock at $ 15 per share. At that time Action Domestic, Inc. adopted a plan to issue section 1244 stock. Thus, stock issued prior to January 22, 1974 would qualify as section 1244 stock pursuant to the plan. No stock was ever sold, but stock was issued to petitioners in exchange for advances or capital contributions they made to the corporation. In 1972 Action Domestic, Inc. obtained a loan from Columbia Union Bank and Trust Co. in the amount of $ 8,400 to acquire the assets and goodwill of the laundromat, to remodel and redecorate the laundromat, and to acquire ten new washers from Coin-O-Matic Enterprises. Petitioners in their individual capacity signed this loan as guarantors. *310 Action Domestic, Inc. initially made the payments on the loan, but petitioners as guarantors took over these payments on July 14, 1975, and continued up until the loan was repaid. As petitioners repaid this loan, they claimed the amounts as a bad debt on their Federal income tax returns for the taxable years 1975, 1976, 1977, 1978, and 1979. On December 21, 1972, the corporation held a special stockholders' meeting at which the sole stockholders, petitioners, elected to be taxed as a subchapter S corporation. On January 20, 1973, the corporation held its annual stockholder's meeting. At this meeting the corporate minutes expressed the president's, Mr. Tippin's, optimism, noting the possibility that the corporation might show a profit in the first year of operation. The only major problem of the corporation was that the hot water heater at the laundromat had broken down in early December of 1972 and the corporation was having a difficult time getting replacement parts. The corporate minutes noted that petitioners had advanced $ 620 to Action Domestic, Inc. during 1972, which would be converted to stock at $ 15 a share on January 200, 1973, under the original stock offering *311 of January 22, 1972. [5] Petitioners, as sole shareholders, deducted $ 1,907 on their Federal income tax return as their portion (100 percent) of the corporation's net operating loss for 1973. The minutes for the annual stockholders' meeting a year later, on January 19, 1974, discussed the corporation's difficult over a three-month period in getting the hot water heater properly repaired. This damage to the hot water heater caused a loss of customers and a decrease in revenues from about $ 220 per week to approximately $ 132 per week. The corporate minutes also noted that during 1973 petitioners advanced $ 2,540 to the corporation, which was converted to stock at $ 15 per share on January 19, 1974, under the original stock offering of January 22, 1972. [6] Petitioners, as sole shareholders, deducted $ 1,161 on their Federal income tax return as their portion (100 percent) of the corporation's net operating loss for 1974. On January 18, 1975, Action Domestic, Inc. *312 held its last annual stockholders' meeting. The minutes of the meeting described the corporation as being in a "dire financial status." The corporate minutes attributed the decline of revenue to the lack of capital and the time when the laundromat was without hot water because the hot water heater was broken. Due to the lack of capital, a significant amount of routine maintenance in the laundromat had been deferred, with the result that about 25 percent of the washers were inoperative at that time. The average revenue was then down to $ 112.21 per week, although Mr. Tippin indicated at the stockholders' meeting that the corporation needed $ 260 per week. In his progress report at the meeting, Mr. Tippin stated that it did not appear likely that the corporation would receive any additional bank financing to resolve the corporation's financial problems. Mr. Tippin noted that the prospect of selling the business and taking a loss rather than continuing "a losing effort" was suggested. In late 1974 or early 1975, petitioners attempted to sell the corporation, Action Domestic, Inc., but no sale could be consummated. During 1974 petitioners had advanced $ 988 to the corporation, *313 which was converted to stock at $ 15 per share on January 18, 1975, under the original stock offering of January 22, 1972. [7] Petitioners, as sole shareholders, deducted $ 2,226.36 as their portion (100 percent) of the corporation's net operating loss for the taxable year 1975. After 1974 petitioners made no further advances or contributions to capital to Action Domestic, Inc. Action Domestic, Inc. reported $ 100 as gross income on its Federal income tax return for the taxable year 1975. That $ 100 income figure was an estimate made by Mr. Tippin, and possibly on the high side. In 1975 petitioners withdrew all of the remaining cash, totaling $ 371, from Action Domestic, Inc. In 1975 Action Domestic, Inc. surrendered its leasehold interest in real estate located at 2631 Holmes, where the laundromat was located. At that time all of the corporation's depreciable assets were transferred to the landlord in payment of $ 900 back rent, and a loss of $ 1,420 was claimed in connection with those assets on the 1975 corporate return. On its corporate income tax return for 1975 Action Domestic, Inc. also wrote *314 off the goodwill that it had purchased from the Meiners and listed under "other assets" on the corporation's 1972, 1973, and 1974 income tax returns. Although Action Domestic, Inc. filed corporate income tax returns for the taxable years 1972, 1973, 1974, and 1975, no further corporate income tax returns were filed after 1975. Also in 1975 the corporation surrendered its corporate charter. In 1979 the Division of Employment Security of the State of Missouri canceled the corporation's employer account since Action Domestic, Inc. had reported no employees after 1974. The corporation never took any steps to renew its employer number or to reinstate its corporate charter. On Schedule A of their 1980 Federal income tax return, petitioners claimed $ 1,550 as bad debts and $ 1,020 of that amount was a loss claimed in regard to petitioners' stock in Action Domestic, Inc. On November 8, 1983, respondent mailed a timely statutory notice of deficiency respecting the taxable year 1980 to petitioners, disallowing $ 1,050 of the claimed $ 1,550 for bad debts. Only the $ 1,020 for the loss on the stock is at issue in this case. OPINION Section 165(g) provides that if any stock becomes *315 worthless during the taxable year, the loss is treated as a loss on the last day of the taxable year. The deduction is lost if not taken in the year of worthlessness and there is no partial deduction as in the case of a bad debt. See Butler v. Commissioner,45 B.T.A. 593, 600 (1941). [8] Worthlessness is a question of fact in which the taxpayer has the burden of proof as to whether the stock became worthless and whether it became worthless in the year in issue. Boehm v. Commissioner,326 U.S. 287, 293-294 (1945); Scifo v. Commissioner,68 T.C. 714, 725 (1977). The standard for determining worthlessness is a flexible, practical one that varies according to all of the facts and circumstances of each case. Boehm v. Commissioner, supra,326 U.S. at 293; Lincoln v. Commissioner,24 T.C. 669, 694 (1955), affd. 242 F.2d 748 (6th Cir. 1957). To prove that stock became worthless in a certain year, the taxpayer must establish that the stock had value as of the beginning of the year and that an identifiable *316 event of series of events destroyed the actual value and the hope or expectation that the stock would become valuable at some future time. Sec. 1.165-1(d)(1), Income Tax Regs.; Boehm v. Commissioner, supra,326 U.S. at 291; Nelson v. United States,131 F.2d 301, 302 (8th Cir. 1942). The stock of a corporation has no actual or liquidating value when the corporation's assets are less than its liabilities, but the stock may still have potential value if there is a reasonable hope or expectation that it may become valuable at some future time. Nelson v. United States, supra;Morton v. Commissioner,38 B.T.A. 1270, 1278 (1938), affd. 112 F.2d 320 (7th Cir. 1940). To prove that the stock has potential value, the taxpayer's belief in the stock's future prospects must be the belief of a prudent businessman and not that of an "incorrigible optimist." United States v. White Dental Co.,274 U.S. 398 (1927); Steadman v. Commissioner,50 T.C. 369, 377-378 (1968), affd. 424 F.2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970). Identifiable events evidencing *317 the loss of potential value are events in the corporation's life which put an end to any reasonable hope and expectation and such events within the corporation that are likely to be immediately known by everyone having an interest by way of stock holdings or otherwise in the affairs of the corporation. Morton v. Commissioner, supra,38 B.T.A. at 1278-1279. These events might include the bankruptcy of the corporation, liquidation of the corporation, appointment of a receiver, or cessation from doing business. Morton v. Commissioner, supra,38 B.T.A. at 1278. Both liquidating value (actual value) and potential value must be wiped out before the stock can be said to be worthless. In this case petitioners argue that their stock in Action Domestic, Inc. did not become worthless until 1980 when petitioners, as the officers, directors, and sole shareholders of the corporation, no longer had time, because of Mr. Tippin's growing law practice and Mrs. Tippin's new job, to operate and manage the corporation, including the team maid service proposal. Petitioners' argument assumes that the stock had some value on January 1, 1980, and lost that value during *318 the year. Respondent argues that the stock was worthless in 1975 since Action Domestic, Inc. transferred all of its fixed assets to creditors in payment of debts in 1975, all of the remaining cash was distributed to the shareholders in 1975, the corporate charter was surrendered in 1975, and all normal business operations ceased in 1975. To determine whether the stock became worthless in 1980, we must determine whether it had any value at the beginning of that year, and, if so, whether during that year an identifiable event or series of identifiable events occurred that destroyed the actual value and any reasonable hope or expectation of potential value in the stock. Both parties appear to agree that petitioners; stock in Action Domestic, Inc. had no actual or liquidating value after 1975. Prior to 1975 the revenues of the corporation had steadily declined due primarily to the lack of capital. By December 31, 1975, the balance sheet showed no assets and $ 3,000 still due on the bank loan. Petitioners as guarantors on that loan paid it off over the next four years, claiming bad debt deductions each year for their payments. Since the debts far exceeded any assets in 1975, the *319 stock had no actual or liquidating value in 1975 or thereafter. Those who had an interest in or dealings with Action Domestic, Inc. were alerted to identifiable events indicating a loss of the stock's potential value long before petitioners determined in 1980 that they could no longer run the business. By 1975 petitioners no longer made any advances or capital contributions to the corporation. Instead, in 1975 petitioners withdrew all of the remaining cash in the corporation, surrendered the corporation's lease in the building where the laundromat was located, and transferred all of the depreciable assets to the landlord in payment of back rent. In addition, after 1975 the corporation no longer held stockholders' meetings, no longer filed tax returns, and no longer had a corporate charter. Petitioners took over the payments of the corporation's loan in 1975 and deducted the payments as bad debts on their Federal income tax returns for 1975 through 1979. The corporation in 1975 claimed a loss on the assets transferred to the landlord and also wrote off its asset of goodwill on its corporate income tax return for the taxable year 1975. All of these actions indicate petitioners *320 did not have any reasonable hope or expectation in the potential value of Action Domestic, Inc. All of these actions would also alert anyone else having an interest in the corporation of this fact. By the end of 1975 the corporation no longer had a leasehold, any assets to run a laundromat or any other business, or any cash. From 1975 to 1980, petitioners had ample time to run a business but there was no business for them to run. Their subjective determination in 1980 that they could no longer devote any time to the corporation did not change anything. In addition, when Action Domestic, Inc. surrendered its Missouri charter in 1975, the corporation lost all the powers, privileges, and franchises conferred upon it under Missouri law. In Missouri if the corporate charter is forfeited, all the powers, privileges, and franchises conferred upon the corporation by the certificate or license are canceled and the corporation is dissolved. Mo. Ann. Stat. 351.525 (Vernon 1966). Any person who exercises the powers, privileges, or franchises of the corporation after the certificate of incorporation has been forfeited is guilty of a misdemeanor. Mo. Ann. Stat. 351.530 (Vernon 1966). *321 The directors and officers in office when the forfeiture occurs become the trustees of the corporation and have full authority to wind up the business. Mo. Ann. Stat. 351.525 (Vernon 1966); Leibson v. Henry,356 Mo. 953, 204 S.W.2d 310, 316 (1947). The corporate charter may be reinstated upon payment of all fees, charges, and penalties that may have accrued by reason of the failure to file the registration and antitrust affidavit and the payment of all franchise taxes. Mo. Ann. Stat. 351.540 (Vernon 1966). The reinstatement of the corporate charter can be accomplished at any time and has a retroactive effect that is effective from the date of forfeiture. A.R.D.C., Inc. v. State Farm Fire and Ca. Co.,619 S.W.2d 843, 846 (Mo. App. 1981). After 1975 Action Domestic, Inc. no longer had a right to its corporate name and was required to cease all normal business operations. Although petitioners could have reinstated the corporate charter of Action Domestic, Inc., they have never done so. The cessation of normal business operations that occurs with the forfeiture of a corporate charter is another identifiable event in the corporation's life that *322 indicates worthlessness of the stock. Steadman v. Commissioner, supra,50 T.C. at 377. Thus, the cessation from doing business and the effective liquidation of Action Domestic, Inc. were identifiable events in 1975 that destroyed the stock's potential value. Petitioners assert, however, that the events in 1975 were not identifiable events indicating worthlessness. They argue that those events did not actually destroy petitioners' reasonable belief and expectation that the stock had value. The corporation still had potential value, petitioners contend, because the corporation still retained a major asset after 1975, the team maid service handbook and proposal, and this value was not destroyed until petitioners no longer had the time to implement the proposal. Petitioners claim that in 1980 they no longer had the time to devote to Action Domestic, Inc., since Mrs. Tippin accepted a new supervisory position that required extensive travel and Mr. Tippin's law practice was growing and expanding by that time. We conclude that petitioners' decision that they no longer had time for the corporation and their subjective determination at that time to abandon the team *323 maid service proposal did not constitute identifiable events evidencing the worthlessness of their stock in 1980. On this record, we cannot find that the team maid service proposal and handbook had any value at the beginning of 1980 or were ever assets of Action Domestic, Inc. Petitioners have not shown that Action Domestic, Inc. was no longer able to operate because of petitioners' otherwise full schedules. Petitioners could have accommodated their busy schedules by hiring agents to run Action Domestic, Inc. if, as they say, the corporation and the team maid service proposal and handbook were still viable. However, we are satisfied they were not. Petitioners could not maintain a reasonable belief in the potential value of the corporation based on the team maid service proposal and handbook. The handbook and proposal were never transferred to Action Domestic, Inc., and assuming they had any value at all, they were never shown as assets of the corporation. Any costs petitioners may have incurred in 1969 or 1970 in developing the handbook and proposal were never capitalized or otherwise reflected on the corporation's balance sheet Action Domestic, Inc. was incorporated in 1972; *324 in contrast the $ 200 for goodwill purchased from the Meiners as part of the laundromat business was capitalized and reflected on the balance sheet. The handbook and proposal were merely an idea for a project, entirely separate from Action Domestic, Inc., that never received the financing it needed to get off the ground. No assets were ever purchased for the team maid service, no employees were ever hired, and no market research was ever conducted after 1970 to see if such a project could be a viable business activity. When petitioners incorporated Action Domestic, Inc. in 1972, no mention was ever made of a team maid service in the corporate charter or bylaws, in the minutes of the board of directors' or annual stockholders' meetings, in the balance sheets of Action Domestic, Inc., or in any other corporate book or record. When Action Domestic, Inc. obtained a loan to finance the purchase of the laundromat, the financial agreement with the lender did not indicate that any of the loan proceeds were to be used for the team maid service. We conclude that the potential value of Action Domestic, Inc. did not rest on the possible success or failure of the team maid service proposal *325 and handbook since they have not been shown to be assets of Action Domestic, Inc. Even if we could find that the team maid service proposal and handbook were assets of Action Domestic, Inc., we would still find the corporation had no potential value after 1975. The record indicates that the team maid service proposal was not a viable business project project in 1970. After 1970 the team maid service project was never tested and no market research was done to determine whether such a project could ever become a viable business activity. Any hope that petitioners entertained that Action Domestic, Inc. had potential value based on this handbook and proposal would be wholly unreasonable and that of incorrigible optimists. Based on all of the foregoing, we conclude that any reasonable belief in the potential value of Action Domestic, Inc. was destroyed, and all potential value of the corporation was destroyed when petitioners ceased business operations and liquidated the corporation's assets in 1975. Thus, we find as a fact that petitioners' stock became worthless in 1975. [9]
*326 To reflect the concessions and the foregoing holding, Decision will be entered nder Rule 155.
APPENDIX Respondent noted in his brief that even if the stock became worthless in 1980 petitioners are not entitled to deduct the entire amount of $ 1,020 as claimed on their 1980 Federal income tax return. Respondent pointed out, and correctly so, that petitioners had failed to reduce their adjusted basis in the stock by their portion of the net operating losses attributable to the stock. Properly computed with such required adjustments to basis, respondent argued, any loss deduction allowable to petitioners would be limited to $ 20. Petitioners did not respond to this argument. However, there is an arithmetical error in respondent's computation, the net operating losses for 1973, 1974, and 1975 totalling $ 5,294.36 rather than the $ 5,254.36 figure used by respondent. Properly computed with the required adjustments to basis and with the correct total net operating loss figure, the amount allowable as a loss deduction appears to be zero. Under section 165(g), a security that becomes worthless during the taxable year is treated as a loss from the sale or exchange of a *327 capital asset. The loss from the sale or exchange is the excess of the adjusted basis over the amount realized. Sec. 1001(a). Since the stock is worthless, the amount realized is zero. Under section 1376(b)(1), the basis of stock in a subchapter S corporation is reduced by the stockholder's portion of the net operating loss attributable to the stock. In this case petitioners' basis in their stock is $ 5,648, which includes the stock petitioners originally purchased as well as the stock petitioners received in exchange for the later advances or contributions to capital. Petitioners' portion of the total net operating losses was 100 percent, the total $ 5,294.36. Thus, petitioners' remaining basis is only $ 353.64. This amount must be further reduced by the cash distribution petitioners received from Action Domestic, Inc. in 1975. Under section 301(c)(2), a distribution by a corporation to a stockholder with respect to its stock that is not a dividend is applied to and reduces the adjusted basis of the stock. A dividend is defined as a distribution made by a corporation to its stockholders out of its earnings and profits of the taxable year. Sec. 316(a)(2). Since Action Domestic, *328 Inc. had no earnings and profits, the distribution was not a dividend, and thus petitioners' remaining stock basis of $ 353.64 is reduced by the cash distribution of $ 371. However, that would result in a negative figure, ($ 17.36). Section 1376(b)(1) provides that the basis of the shareholder's stock is reduced "(but not below zero)" by his portion of the corporation's net operating loss for the year. Accordingly, petitioners' adjusted basis in their stock after December 31, 1975 is zero, the amount realized in 1980 is zero, and there would appear to be no loss deduction allowable in 1980. Actually it appears that petitioners may have had a gain of $ 17.36 in 1975 from the cash distribution. *
*329 Footnotes
1. Petitioners conceded respondent's adjustments made in the statutory notice of deficiency for interest expenses, travel expenses, equipment expenses, and publication expenses that petitioners deducted on their Schedule C. Respondent conceded the adjustment made in the statutory notice disallowing an auto expense. The parties agreed that the self-employment tax was an automatic adjustment and would be adjusted based on the final determination in this case. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
3. Mr. Tippin had not yet completed law school at that time. ↩
4. Petitioners requested a finding of fact that the corporate charter stated that one of the purposes of the corporation was to engage in the business of "providing services to the home-maker." However, neither the articles of incorporation nor any bylaws were offered in evidence, and there is no support in the record for petitioners' requested finding. Moreover, "providing services to the home-maker" does not necessarily refer to the team maid service and could well apply to the laundromat service that the corporation engaged in. ↩
5. Petitioners' stock ownership thus increased from 50 shares each to 70-1/2 shares each. ↩
6. Petitioners' stock ownership thus increased from 70-1/2 shares each to 155-1/2 shares each, when rounded off. ↩
7. Petitioners now each had 188-1/2 shares in Action Domestic, Inc. ↩
8. Universal Consolidated Oil Co. v. Commissioner,T.C. Memo. 1961-246↩. 9. While worthless stock cases can and do present complex factual issues, it is unfortunate that the parties did not resolve this case without litigation. The small deficiency in issue hardly warranted the parties' expenditure of time and effort at trial and on brief. More importantly, the amount of any allowable loss deduction here, even if petitioners had prevailed on the disputed factual issue, is not merely the small amount of $ 20, as calculated by respondent on brief, but apparently zero. See Appendix to this Opinion. The interests of both the parties and this Court would have been better served had there been a proper analysis before trial or at least on brief as to exactly what, if anything, was really at stake in this case. All that remains is to give effect to respondent's concession of a $ 237 auto expense item. ↩
*. The record does not indicate whether petitioners reported any of the $ 371 cash distribution as income in 1975, so as to acquire a nominal increase in basis under sections 1373(b) and 1376(a). Also the record does not indicate whether in 1975 petitioners deducted all of the $ 2,226.36 net operating loss of the subchapter S corporation for 1975 as an ordinary loss. Sec. 1244(a). Some $ 988 of petitioners' basis related to non-section 1244 stock, and section 1374(c)(2) provides that the shareholder's portion of the subchapter S corporation's net operating loss cannot exceed the adjusted basis of his stock. Thus in 1975 an allocation of the loss should have been made between section 1244 stock and non-section 1244 stock. See sec. 1.1376-2(a)(2)(1), Income Tax Regs.; sec. 1.1244(d)-2, Income Tax Regs.↩ Thus, some portion of the 1975 loss would have been capital loss, rather than ordinary loss, and the $ 17.36 gain would probably be capital gain rather than ordinary income.