T.C. Memo. 2019-158

UNITED STATES TAX COURT

MCM INVESTMENT MANAGEMENT, LLC, MARK AND C'ANN
MCMILLIN FAMILY TRUST DATED 04/09/1990,
TAX MATTERS PARTNER, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13550-15.            Filed December 10, 2019.

<u>David Colker</u>, <u>David F. Gross</u>, and <u>Henry C. Cheng</u>, for petitioner.

<u>Donna L. Crosby</u>, <u>Heather K. McCluskey</u>, <u>Chad E. Martinelli</u>, and

<u>Terri L. Onorato</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>: In a notice of final partnership administrative action dated

March 3, 2015, respondent made an adjustment to ordinary income of $40,962,936

[*2] for tax year 2009.[1]  The issues for decision are whether:  (1) MCM

Investment Management, LLC (MCMIM), is entitled to a loss deduction claimed

with respect to a partnership interest that MCMIM reported became worthless

during 2009 and (2) MCMIM is liable for an accuracy-related penalty for 2009

pursuant to section 6662(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found, and they are

incorporated in our findings by this reference.  MCMIM is a limited liability

company (LLC) organized under Delaware law and treated as a partnership for

Federal income tax purposes.  When the petition was timely filed, MCMIM's

principal place of business was in California.

I. Background on the McMillin Entities

In 1960 Macey L. McMillin, Jr. (Corky), entered into the home building and

remodeling industry.  By 2009 Corky's real estate business had expanded into a

group of over 110 entities beneficially owned by Corky and his immediate family

members, including his wife, Vonnie McMillin, and their three children, Mark

McMillin, Scott McMillin, and Laurie Ray (collectively, McMillin children).  The

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended, in effect for the year in issue.  Dollar amounts are rounded to the nearest dollar.

[*3] family members owned their respective interests through family trusts. We have simplified the ownership descriptions below to focus on the entities relevant to our analysis.

A. Companies

On April 1, 1998, the McMillin family formed McMillin Companies, LLC (Companies), a Delaware LLC. Companies--the largest of the McMillin family entities--was in the real estate development and sales business in California and Texas. During 2009, the year in issue, Companies was involved in three distinct lines of real estate development: single-family homebuilding, master-planned communities, and commercial development and management. Companies' business lines were operated through various wholly owned and multimember (joint venture) LLCs (project entities). Each project entity held real estate for land development and homebuilding. During 2009 Companies held investments in 73 project entities, 11 management services entities, and 3 investment-holding companies.

In 2004 Companies' owners were four S corporations organized under California law (class A members). The class A members in turn were owned by trusts owned by Corky, Vonnie, and the McMillin children. During 2009 Scott McMillin served as chairman and chief financial officer, Mark McMillin served as

**[*4]** president and chief executive officer, and Laurie Ray served on the managing board.

B. <u>MCMIM</u>

On November 8, 2004, the McMillin family formed MCMIM to "serve as a vehicle for making an investment in * * * [Companies]" and to serve as Companies' manager. At the time of its formation MCMIM was owned by the same trusts that owned the class A members.

Following Corky's death on September 22, 2005, the McMillin family trust--an owner of MCMIM as well as the class A members--transferred its equity interests in MCMIM and the class A members to a survivor's trust owned by Vonnie (survivor's trust). In April 2006 the survivor's trust sold its equity interests in MCMIM and each of the class A members to three irrevocable trusts owned by the McMillin children. On December 31, 2008, each of the three irrevocable trusts transferred its equity interest in MCMIM back to the survivor's trust. During the year in issue the survivor's trust held a 21.67% interest in MCMIM. During 2009 Mark McMillin served as MCMIM's co-chairman and co-chief executive officer; Scott McMillin served as co-chairman, co-chief executive officer, and chief financial officer; and Laurie Ray served on the managing board.

[*5] II. MCMIM's Investment in Companies

On November 8, 2004, MCMIM contributed $30 million to Companies in exchange for a partnership interest that entitled MCMIM to receive distributions equal to its capital contribution plus interest, as stated in and adjusted by Companies' operating agreement as amended from time to time. Upon MCMIM's admission as member and company manager, MCMIM and the four class A members each received a 20% voting interest in Companies. Companies' managing board had seven members, including at least two individuals who were independent, and met quarterly.

MCMIM made two additional capital contributions to Companies: $22,500,000 on June 30, 2005, and $5,091,370 on March 28, 2008. At the time of each contribution, the members agreed that MCMIM would receive all subsequent distributions from Companies until MCMIM received the amount of each capital contribution plus specified interest. MCMIM received the entire amount of its 2005 contribution with interest from Companies by December 31, 2005.

III. Debt Financing

We now turn to the financing and financial climate that is the backdrop for the dispute before us.

**[*6]** A. <u>Entity-Level Debt</u>

In 1998 Companies borrowed $35 million from American Money Corp. (senior lender), a subsidiary of American Financial Group, Inc. (AFG). AFG--an entity unrelated to Companies--is an Ohio-based multibillion-dollar financial services holding company. The debt was secured by Companies' assets, including pledges of an economic interest in each of the project entities. The loan documents also required that Companies obtain the senior lender's approval before it made material outlays of cash.

In 2005 with the success of Companies' real estate development business, Companies refinanced its debt with $100 million of notes payable plus interest (senior debt). The senior debt loan documents required that Companies make a principal payment of $30 million in 2007, and that the remaining $70 million of principal be paid down in a series of scheduled quarterly payments beginning on November 1, 2011, and continuing until the senior debt matured on October 31, 2013, when all remaining principal and accrued interest was due and payable.

In 2005 Companies also borrowed $62.5 million (subordinate debt) in two separate debt instruments from Taberna Preferred Funding I and Taberna Preferred Funding II (collectively, Taberna)--entities unrelated to Companies. The subordinate debt was secured by Companies' assets and subordinate to the liens

[*7] created under the senior debt documents. The first subordinate debt instrument, dated March 15, 2005, required quarterly interest payments on principal of $25 million at a fixed interest rate through March 2015, then at a variable interest rate, and would mature on March 30, 2035. The second subordinate debt instrument, dated September 30, 2005, required quarterly interest payments on principal of $37.5 million at a fixed interest rate through October 2015, then at a variable interest rate, and matured on October 30, 2015.

B. Project-Level Debt

Companies' project entities also incurred acquisition, development, and construction loans to finance their respective projects (project debt). Each project debt lender was unrelated to MCMIM and Companies. The project debt was secured by the real property held by the particular borrowing project entity. Additionally, MCMIM and the class A members, together called Select Corporate Entities (SCEs), jointly and severally guaranteed the project debt.

The loan documents for the project debt and the senior debt included cross-default provisions. Thus, a default on senior debt constituted a default on project debt, and a default of at least $10 million on project debt (either on a single loan or in the aggregate) constituted a default on senior debt.

[*8] IV. <u>Companies' Financial Deterioration</u>

The subprime mortgage crisis that began in 2007 hit Companies' business. Subprime mortgages were prevalent in housing markets in which Companies operated, and the values of homes financed with subprime mortgage debt declined in these markets in particular at unprecedented rates. During 2008 Scott McMillin attempted to secure additional financing for Companies from various investment entities (e.g., hedge funds and large homebuilders) but was unsuccessful.

A. <u>Cashflow Forecasts</u>

In 2008, in response to the deteriorating market conditions, Companies monitored its cashflow more closely. Companies' senior vice president of finance, Robin Lewis, created a cashflow forecast tool with various scenarios to analyze Companies' financial condition, including its ability to comply with debt covenants and cashflow timing. Companies' cashflow forecasts were created using information from Companies' consolidated balance sheet, information from the business plans developed at the project level, and information concerning corporate obligations and financial data from Companies' corporate accounting group forecasts. To that Ms. Lewis added information about assumptions on Companies' senior debt. Ms. Lewis presented these cashflow forecasts to Companies' executive committee and managing board beginning in 2008. By

**[*9]** 2008 Ms. Lewis held a degree in accounting and finance from the University of Arizona, had more than six years' experience as an audit manager with KPMG, and had approximately six years' experience working at Companies, where she progressed to senior vice president of finance.

Companies also provided monthly forecasts to its project lenders. By the end of 2008, because the real estate market continued to decline, Companies removed new projects from its forecasts.

Companies' project-level business plans were an important input in the cashflow forecasts. They were a required attachment to operating agreements entered into with joint venture partners and were updated regularly. Companies followed its internal policy regarding the frequency of business plan updates and disclosures to the executive committee. The business plans included homebuilding plans that were updated regularly using construction contracts, sales timing, and sales pricing information. The land development and commercial properties plans were updated a few times a year and reviewed primarily by project teams.

B. Changes in Ownership

In response to declining asset values, the McMillin family decided to shift Companies' ownership from S corporations to LLCs. Therefore, on October 1,

[*10] 2008, the McMillin family formed eight LLCs (eight LLCs) under the laws of Delaware; the various trusts owned by the McMillin children were members. On October 23, 2008, the four class A members assigned their economic and membership interests in Companies to the eight LLCs, in effect converting the class A members to LLCs. The eight LLCs became SCEs along with MCMIM. After the assignment, Companies had nine members: the eight LLCs (i.e., the class A members) and MCMIM. All now were guaranteeing the project debt. On December 31, 2008, the irrevocable trusts that had acquired equity interests in the original class A members from the survivor's trust owned by Vonnie in April 2006 transferred their respective equity interests in three of the eight class A members to the survivor's trust.

## C. Acquisition of Subordinate Debt

In 2008 Companies' project debt lenders raised concerns to Companies regarding the subordinate debt. Cashflow projections suggested Companies would be unable to pay the subordinate debt. Beginning in May 2008 Companies negotiated with Taberna concerning a discounted payoff of the subordinate debt. However, because of the senior lien on Companies' assets as well as other covenants in the senior debt loan documents, Companies' ability to use its cash to pay down the subordinate debt--even at a steep discount--was limited. In addition

[*11] the McMillin family and the SCEs did not want to contribute additional cash to Companies because those funds would become subject to the senior lien immediately. Instead Companies' management concluded that a McMillin entity might be able to purchase the subordinate debt at a discount. Companies' management believed that acquisition by a related entity would reduce the risk that a third-party holder of the subordinate debt--such as a distressed debt investor-- would attempt to force Companies into bankruptcy.

Ultimately, Taberna agreed to a discounted purchase price of $16 million for the $62.5 million subordinate debt. To facilitate the acquisition the McMillin children formed two additional entities: M3 Investors, LLC (M3), and McMillin Holdings, LLC (Holdings).[2] Scott McMillin served as chairman and chief financial officer and Mark McMillin served as president and chief executive officer for both entities in 2009. M3 was owned in equal shares by the trusts of the McMillin children; Vonnie chose not to invest. Holdings, in turn, was owned by Companies and M3. To capitalize Holdings, Companies made a net capital contribution of $3,900,000 (for a 24.375% interest), and M3 made a net capital contribution of $12,115,000 (for a 75.625% interest).

---

[2] Both M3 and Holdings were formed as LLCs under the laws of Delaware.

[*12] On October 16, 2008, Holdings paid $16 million to acquire all of Taberna's right, title, and interest to and in the subordinate debt. The acquisition was the result of an arm's-length transaction, and Holdings intended to collect the full face amount of the debt of $62.5 million plus interest.

### D. Companies' Financial Distress

Companies' financial condition deteriorated in 2007 and 2008, and it had to record impairment charges with respect to its projects, causing its net worth to decline substantially. In 2007 Companies recorded an impairment charge of $109.8 million under generally accepted accounting principles (GAAP). This included an $88.6 million impairment loss attributable to Companies' interests in its wholly owned and joint-venture assets. The impairments caused Companies to struggle to comply with its various financial covenants under the senior debt and project debt loan documents. The existence of cross-default provisions in the senior debt and project debt loan documents exacerbated default risks for Companies and thus created a risk of bankruptcy.

Toward the end of 2008 Companies fell out of compliance with several covenants in the senior debt loan documents, including the minimum-net-worth requirement, the maximum-debt-to-equity ratio, and the limitations on investments. This triggered a default and motivated Companies to negotiate with

[*13] the senior lender to waive or modify the covenants on the senior debt. During 2008 Companies' owners and management considered bankruptcy as a possibility given Companies' continued financial deterioration, and Companies hired a bankruptcy attorney, Jeff Krause, for advice. Additionally, Companies began to suffer significant capital constraints in 2008. Several project debt lenders stopped funding loans, halting construction at some projects. Finally, in late 2008 the McMillin family decided that they would not make any additional contributions to Companies given its substantial debt burden.

### E. Shoring Up Companies

On December 31, 2008, Holdings contributed the subordinate debt to Companies in exchange for a preferred equity interest in Companies. This debt-to-equity conversion allowed Companies to shed $65,113,711 of debt from its balance sheet and add approximately $59 million[3] of net worth to its GAAP financial statements. As a result Companies reported a net worth of approximately $34.5 million on its audited GAAP financial statements as of December 31, 2008. This allowed Companies to comply with its minimum net-worth covenants and put it in a better position to negotiate debt restructuring with its lenders.

---

[3] This is the amount of the subordinate debt, less the amount Companies contributed towards the acquisition of the subordinate debt.

[*14] The parties to the conversion intended that Holdings' priority of payment on the converted equity interest vis-a-vis Companies' preexisting members "mirror" the subordinate debt position--meaning that Holdings would be entitled to a return of the principal of $65,113,711 and a cumulative preferred return before any other members, including MCMIM, were entitled to distributions in liquidation or otherwise.

Companies' 2008 and 2009 annual reports stated that Holdings, on account of its preferred interest, "has a liquidation preference of $65.1 million plus accrued but unpaid cumulative preference return." At the end of 2009 Companies owed $70 million of senior debt accruing interest at 9.525% per annum, and Holdings had a preferred interest and accrued but unpaid cumulative preferred return that totaled $71,244,958.

F. Companies' Operating Agreement

After the debt-to-equity conversion, Companies' operating agreement was amended to provide Holdings a preferred interest of $65,113,711 and a cumulative preferred return of 9% per annum. The tenth amendment to the operating agreement provides that "[e]xcept as provided in Section 7.3 * * * [describing liquidating distributions]", distributions are first made to Holdings so that it would receive its preferred interest and accrued cumulative preferred return. Companies'

**[*15]** members then executed an eleventh amendment to "clarify that distributions * * * [on account of MCMIM's interest in Companies] to MCMIM are subordinate to distributions to Holdings * * * [on account of its preferred interest in Companies]." Specifically, it stated: "Notwithstanding anything in the * * * tenth amendment to the contrary, * * * MCMIM shall not be entitled to <u>any</u> distributions in respect of its * * * [capital contribution] until such time as Holdings has received * * * [its preferred interest and accrued cumulative preferred return] under Sections 7.2.1 and 7.2.2 of the Agreement." (Emphasis added.)

Section 7.3 of the operating agreement stated that, upon dissolution, "liquidating distributions in all cases shall be made in accordance with the positive Capital Account balances of the * * * [members], as determined after taking into account all Capital Account adjustments for * * * [Companies'] tax year during which such dissolution occurs * * * by the end of such tax year". Section 5.3.1 of the operating agreement stated that each member's "Capital Account" must be maintained in accordance with section 1.704-1(b)(2)(iv), Income Tax Regs. (section 704(b) capital accounts). Section 7.3 of the operating agreement stated that liquidating distributions are made after taking into account section 704(b)

**[*16]** capital account "adjustments for [the] tax year during which such dissolution occurs."

Section 6.1 of the operating agreement stated, in part, that items of income and gain shall be allocated among the members:

a. First, to the Members, in proportion to the amounts by which the cumulative Loss allocated to each Member since the inception of the Company exceeds the cumulative Income allocated to each Member since the inception of the Company, until the cumulative amount of Income allocated to the Members since the inception of the Company equals the cumulative Loss allocated to the Members since the inception of the Company.

b. Second, to Holdings, up to the amount credited to its Memorandum Senior Equity Preference Account, less any Income previously allocated pursuant to the Section 6.1.1.b.

c. Third, to Holdings, until the cumulative amounts allocated to Holdings under the Section 6.1.1.c equals Forty-Nine Million One Hundred Thirteen Thousand Seven Hundred Eleven Dollars ($49,113,711).

"Senior Equity Preference Account" is defined as an account that is maintained to track Holdings' accrued preferred return; amounts "credited" are those amounts accrued over time at rate of 9% per annum.

Section 6.1.2 of the operating agreement stated that items of loss shall be allocated among the members:

a. First, to the Members, in proportion to the amounts by which the cumulative Income allocated to each Member since the inception of

[*17] * * * [Companies] exceeds the cumulative Loss allocated to each Member since the inception of * * * [Companies], until the cumulative amount of Loss allocated to the Members since the inception of * * * [Companies] equals the cumulative Income allocated to the Members since the inception of * * * [Companies].

b.  Second, Net Loss, and each item thereof, of * * * [Companies] for any accounting period shall be allocated to MCMIM and the Class A Members in proportion to their positive Capital Account balances, until their Capital Account balances have been reduced to zero (0).

c.  Thereafter, all Loss shall be allocated 80% to MCMIM and 20% to the Class A Members, in proportion to their Class A Percentages.

Additionally, the operating agreement included a qualified income offset as described in section 1.704-1(b)(2)(ii)(d), Income Tax Regs.  Finally, the operating agreement states that it shall be governed and construed and enforced in accordance with the laws of Delaware.

G.  Ernst & Young Opinion

Ernst & Young, LLP (Ernst & Young), was Companies' independent auditor during 2007-10.  On March 25, 2008, Ernst & Young reported findings from its audit of Companies' financial condition in 2007.  Ernst & Young's Report of Independent Auditors for 2007 states that "the Company incurred operating losses in 2007, was not in compliance with certain financial covenants related to its indebtedness, and certain of its debt matures in 2008.  These matters raise substantial doubt about the Company's ability to continue as a going concern."

**[\*18]** Ernst & Young reported similar findings for 2008. On March 27, 2009, Ernst & Young stated that "the Company incurred operating losses in 2008 and 2007, was not in compliance with certain financial covenants related to its indebtedness, and certain of its debt matures in 2009. These matters raise substantial doubt about the Company's ability to continue as a going concern." Companies' management viewed Ernst & Young's findings regarding Companies' ability to continue as a going concern as a "big red flag".

The financial statements audited by Ernst & Young show a net loss of $108,433,000 for the 2007 tax year and a net loss of $29,492,000 for the 2008 tax year. Those financial statements were included in Companies' annual report that was shared with its lenders.

H. Decision To Wind Down

The home building and real estate market worsened considerably in early 2009. Even after Companies' debt-to-equity conversion, the continued decline in property values prompted lenders to issue notices of default. During 2009 at least seven notices of default and/or demands for loan repayment were issued to 10 of the 73 project entities and the SCEs. These included a notice of events of default and matured loans issued on March 23, 2009, to McMillin Sunnyside Ranch, LLC

[*19] (Sunnyside Ranch), and a notice of default issued on May 19, 2009, to McMillin San Miguel Ranch, LLC (San Miguel Ranch).

For the Sunnyside Ranch project, Companies was able to negotiate a "friendly foreclosure" in which it made a small remargin payment[4] to the project lender, Bank of America, N.A., which agreed to foreclose but release the guarantors from any additional deficiency.

Companies was unsuccessful in negotiating a similar exit with the project lender for San Miguel Ranch. The lender initiated foreclosure in 2009, and the proceeds from the sale of property were insufficient to pay off the debt, leaving a $15.9 million deficiency. Following foreclosure, the lender pursued the SCEs, as guarantors, for the deficiency. The San Miguel Ranch lender did not seek to attach or otherwise recover and sell MCMIM's partnership interest in Companies. After an audit and extensive negotiations, Companies agreed in early 2010 to a $2 million settlement on the $15 million deficiency in exchange for the release of the SCEs from their guaranties.

---

[4] If a property's value declined after the property appraisal, a lender could request a remargin payment--a cash payment for the borrower to reduce the principal of the loan to match the value of the property. If Companies refused to remargin, the project lender could declare a default on the loan. Companies began receiving remargin requests in 2007 because of the subprime mortgage crisis.

[*20] Around 2008, because of the amount and status of Companies' project-level debt, the senior lender became concerned about its ability to collect on the senior debt. The senior lender recorded impairment charges with respect to Companies' senior debt in 2008 and 2009 that together totaled 40%. Consistent with its practice, the senior lender did not inform Companies of the impairment charges. On May 22, 2009, Companies and the senior lender amended the terms of the senior debt, changing the maturity date, interest rates, principal payment dates, and certain covenants (including the minimum-net-worth requirement and the maximum debt-to-equity ratio).

Companies' cashflow forecasts throughout 2009 reflected its continued financial deterioration. The January 2009 cashflow forecast showed that Companies could achieve an ending cash balance of $63,684,000 if it were able to wind down all projects successfully through 2016 and pay its debt. Companies lost or terminated certain projects during the year, and the winddown period for cashflow projections was reduced to five years.

Companies updated its cashflow forecast in December 2009. That forecast projected that Companies would have an ending cash balance of $12.3 million if it could wind down by the end of 2014 and pay off the senior debt. While Companies projected that it could achieve this positive cash balance by the end of

[*21] the winddown, it also projected that it would have a cash shortfall during the winddown period in both 2012 and 2013.

Under the terms of the senior debt loan documents, Companies was required to make $32 million of principal payments in 2012 and approximately $30 million of principal payments in 2013, when the loan matured. But the December 2009 cashflow forecast showed that Companies would not have sufficient cash in 2012 and 2013 to make these required principal payments timely and cash shortfalls of approximately $14 million in 2012 and $7.4 million in 2013 would result.

Companies also prepared a liquidation analysis in 2009. The liquidation analysis showed that if Companies were to liquidate completely in 2009--as an alternative to a gradual winddown over five years--it would have only $51.6 million to pay approximately $70 million in outstanding senior debt.

On the basis of these financial projections Companies concluded that it could not fully repay its senior debt and project debt under the terms of their respective loan documents. And after reviewing Companies' cashflow forecasts, Companies determined that Holdings would not recover the full amount of its preferred equity interest upon liquidation and MCMIM would not receive anything with respect to its interest. Holdings' preferred equity interest and accrued cumulative preferred return would have exceeded $111 million by the end

[*22] of the winddown period in 2014. Toward the end of 2009 Ceci Doty--a senior vice president of Companies responsible for the finance group--informed Companies' executive committee and managing board of its inability to satisfy its debt obligations.

Companies' continued attempts to secure additional funding during 2009 failed. One potential investor insisted that any of its investments occur outside of Companies. To address this concern, in April 2009 the McMillin family formed a new entity--the Corky McMillin Real Estate Group (MREG).

Ultimately, by the end of 2009 Companies' owners decided to wind down the entity. On the basis of its December 2009 cashflow forecast Companies believed it could complete construction of, market, and sell all of its assets in an orderly manner by the end of 2014. Companies' owners believed that an orderly liquidation over five years would be more beneficial to its lenders than a complete selloff of its assets over a shorter timeframe. Companies' owners believed widespread knowledge of this decision would damage morale for existing employees working on building out existing projects and prejudice Companies and the project entities in future debt negotiations with lenders, so it was not memorialized.

[*23] On its 2009 audited consolidated statements of operations, Companies reported a net loss of $39,316,000 for the 2009 tax year. It reported assets of $331,461,000, liabilities of $268,650,000, and members' equity of $62,811,000 as of December 31, 2009. It reported operating revenue of $254,848,000 for 2009, down from approximately $824 million in 2005 before the financial crisis. And according to Companies' 2010 audited consolidated statements of operations, Companies' operating revenue in 2010 was $162,305,000, approximately 35% lower than in 2009.

V. Income Tax Returns

MCMIM filed Form 1065, U.S. Return of Partnership Income, for the 2009 tax year. The 2009 Form 1065 reported an ordinary loss of $41,488,446 on line 6, net gain (loss) from Form 4797, Sales of Business Property, attached to Form 1065. The Form 4797 reflected a $41,488,446 loss from "Worthless Ptrship Interest - McMillin Companies". MCMIM issued to each of its members a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., for the 2009 tax year, that its members reported on their 2009 income tax returns.

On its 2009 Form 1065 Companies reported a net ordinary loss of $49,628,043. MCMIM's Schedule K-1 indicated that it had a GAAP capital account equal to $35,313,701, and a "share" of "capital" equal to approximately

[*24] "0.396%". The class A members reported GAAP capital account deficit balances totaling $62,356,495 on their Schedules K-1 in 2009.

OPINION

I. Burden of Proof

Ordinarily, the burden of proof in cases before the Court is on the taxpayer. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a), in certain circumstances the burden of proof may shift from the taxpayer to the Commissioner. Petitioner filed a motion to shift the burden of proof. We resolve this case on the basis of a preponderance of the evidence in the record. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008), supplementing T.C. Memo. 2007-340; Schank v. Commissioner, T.C. Memo. 2015-235, at *16. We, therefore, will deny petitioner's motion to shift the burden of proof as moot.

The parties agree that the character of the disputed loss would be ordinary. They also agree that MCMIM had a basis of $41,488,446 in its partnership interest as of the time of the claimed worthlessness in 2009. Therefore, the only issue for us to decide is whether MCMIM may deduct the reported loss for 2009, and if not, whether an accuracy-related penalty applies to the resulting underpayment of tax.

**[*25]** II.  <u>Section 165(a) Loss Deduction</u>

Section 165(a) allows a deduction for any loss sustained during the tax year and not compensated for by insurance or otherwise.  To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the tax year.  Sec. 1.165-1(b), (d)(1), Income Tax Regs.  Only a bona fide loss is deductible, and substance prevails over mere form in our analysis.  <u>Id.</u> para. (b).

"In most cases, a 'closed and completed transaction' will occur upon a sale or other disposition of the property, but this requirement also may be satisfied if the taxpayer abandons the asset or the asset becomes worthless."  <u>Tucker v. Commissioner</u>, 841 F.3d 1241, 1249 (11th Cir. 2016) (quoting <u>Proesel v. Commissioner</u>, 77 T.C. 992, 1005 (1981)), <u>aff'g</u> T.C. Memo. 2015-185.  Thus, "worthlessness" is a stand-alone justification for a deduction under section 165(a), and a taxpayer may deduct a loss from an investment in a partnership if the partnership interest becomes worthless during the tax year.  <u>Echols v. Commissioner</u> (<u>Echols I</u>), 935 F.2d 703, 706 (5th Cir. 1991), <u>rev'g</u> 93 T.C. 553 (1989), <u>rehearing denied</u>, <u>Echols v. Commissioner</u> (<u>Echols II</u>), 950 F.2d 209 (5th Cir. 1991); <u>see also</u> <u>Forlizzo v. Commissioner</u>, T.C. Memo. 2018-137.  The parties agree that MCMIM did not abandon its partnership interest in Companies.

[*26] Therefore, we must determine whether the partnership interest became worthless in 2009, the sole remaining challenge to deductibility for that year.

Whether a partnership interest is worthless is a question of fact. See Boehm v. Commissioner, 326 U.S. 287, 293 (1945); Proesel v. Commissioner, 77 T.C. at 1006. The statute's "general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test." Boehm v. Commissioner, 326 U.S. at 292-293 (quoting Lucas v. Am. Code Co., 280 U.S. 445, 449 (1930)).

To prove entitlement to a section 165(a) loss deduction for worthless property, a taxpayer must demonstrate its "subjective determination of worthlessness in a given year, coupled with a showing that in such year the asset in question is in fact essentially valueless." Echols I, 935 F.2d at 708. The requirement that an asset be "essentially" valueless demonstrates "the de minimis rule that the taxpayer does not have to prove that a given asset is absolutely, positively without any value whatsoever." Id. n.2. But, "while a taxpayer need not be 'an incorrigible optimist in his determination of when property becomes worthless, a mere decline, diminution, or shrinkage in value is not sufficient to establish a loss.'" Tucker v. Commissioner, 841 F.3d at 1251 (quoting Proesel v. Commissioner, 77 T.C. at 1006). In sum, we must determine whether MCMIM

**[\*27]** subjectively determined that its partnership interest in Companies was worthless in 2009 and whether objective factors confirm that the interest became essentially valueless in that year.  See Echols II, 950 F.2d at 213 ("Our opinion expressly holds that the test for worthlessness is a combination of subjective and objective indicia:  a subjective determination by the taxpayer of the fact and the year of worthlessness to him, and the existence of objective factors reflecting completed transaction(s) and identifiable event(s) in the year in question[.]").

   A.  Subjective Determination

We first consider whether MCMIM subjectively determined that its partnership interest in Companies was worthless in 2009.  Echols v. Commissioner, 935 F.2d at 707 ("[T]he more important question of when a property is worthless for purposes of a loss deduction under * * * [section] 165(a) is, like beauty, largely in the eyes (more accurately, the mind) of the beholder (more accurately, the holder).").  The subjective determination of the taxpayer, while not conclusive, is entitled to great weight.  Id. at 708; A.J. Indus., Inc. v. United States, 503 F.2d 660, 670 (9th Cir. 1974) ("The subjective judgment of the taxpayer (here the management) as to whether the business assets will in the future have value is entitled to great weight and a court is not justified in substituting its business judgment for a reasonable, well-founded judgment of the taxpayer.");

[*28] <u>Oak Harbor Freight Lines, Inc. v. Commissioner</u>, T.C. Memo. 1999-291, 1999 WL 680132, at *2-*3 (citing <u>Echols II</u>, 950 F.2d 209, and <u>A.J. Indus., Inc.</u>, 503 F.2d 660). In <u>Echols I</u>, 935 F.2d at 708, the court emphasized the discretion a taxpayer has in claiming a loss deduction under section 165(a) for a worthless partnership interest:

> The admittedly belabored point of this analysis is that the IRS cannot disallow * * * [a section] 165(a) deduction by a taxpayer who can demonstrate his subjective determination of worthlessness in a given year, coupled with a showing that in such year the asset in question is in fact essentially valueless. Proof by the IRS that the asset in question may have been of virtually no value in a prior year, or that, despite being of little or no value, the asset might have been deemed worthy of continued holding by some other taxpayer, even one similarly situated, would not defeat the bona fide determination of worthlessness by the taxpayer in the year he selects. Just as a taxpayer is entitled to exercise his own investment judgment and discretion in the timing of an overt act of abandonment, he is also entitled to the same exercise of judgment and discretion in determining when an asset is worthless to him, given a reasonable showing that the asset was in fact valueless at the time selected by the taxpayer--not that its fair market value necessarily fell to or below zero in that year. [Fn. ref. omitted.]

We conclude that MCMIM subjectively determined that its partnership interest in Companies was worthless by the end of 2009. First, MCMIM took the position on its tax return that the partnership interest was worthless in 2009. <u>See</u> <u>id.</u> at 707 (noting that taking loss deduction on tax return is manifestation of taxpayer's intent that partnership interest was worthless). Second, the owners and

[*29] management of MCMIM and Companies testified credibly at trial that they believed MCMIM's interest became worthless in 2009. They based their belief, in part, on the dramatic and devastating impact of the financial crisis that began in 2007, Companies' consistent operating losses in the years leading up to and including 2009, the subordinate position of MCMIM's partnership interest to Holdings, and the overwhelming debt burden of Companies and its project entities. The owners and management took into account Companies' deteriorating cashflow projections during 2009. Those projections showed that Companies would be unable to satisfy financial obligations owed to the senior lender, the subordinate lender, or the project debt lenders. Ultimately, the McMillin family decided to wind down Companies in an orderly manner to maximize value for the creditors. These facts support our conclusion that MCMIM subjectively believed its partnership interest in Companies was worthless in 2009.

B. Objective Factors Indicating Worthlessness

We now consider whether objective indicia confirm an absence of substantial value in 2009. See id. at 707 ("[P]roperty cannot be treated as worthless for tax loss purposes if at the time it, objectively, has substantial value."). Section 1.165-1(b), Income Tax Regs., requires that the reported loss be "evidenced by closed and completed transactions, fixed by identifiable events, and

**[\*30]** \* \* \* actually sustained during the tax year." See also Echols II, 950 F.2d

at 212-213 ("[I]n order to comply with \* \* \* [section 1.165-1(d)(1), Income Tax

Regs.,] the analysis should focus on objective events confirming the taxpayer's

subjective determination that the asset was in fact worthless in the year in which

the loss was claimed."); sec. 1.165-1(d)(1), Income Tax Regs.

We laid out principles for determining worthlessness in the context of

equity interests in Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938),

aff'd, 112 F.2d 320 (7th Cir. 1940):

> The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.

> There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders. In such cases the stock, obviously, has no liquidating value, and since the limits of the corporation's future are fixed, the stock, likewise, can presently be said to have no potential

[*31] value.  Where both these factors are established, the occurrence in a
        later year of an "identifiable event" in the corporation's life, such as
        liquidation or receivership, will not, therefore, determine the
        worthlessness of the stock, for already "its value had become finally
        extinct."  * * *

Morton involved worthless corporate stock, and courts have applied these

principles routinely in other cases involving securities.  See, e.g., Nelson v. United

States, 131 F.2d 301 (8th Cir. 1942); Austin Co. v. Commissioner, 71 T.C. 955,

969-970 (1979); Steadman v. Commissioner, 50 T.C. 369, 376 (1968), aff'd, 424

F.2d 1 (6th Cir. 1970); Flint Indus., Inc. v. Commissioner, T.C. Memo. 2001-276,

2001 WL 1195725; Corona v. Commissioner, T.C. Memo. 1992-406, aff'd, 33

F.3d 1381 (11th Cir. 1994).

        Petitioner argues that the test set out in Morton applies equally to whether

MCMIM's partnership interest in Companies was objectively worthless.  We agree

that the principles articulated in Morton and cases involving worthless stock may

apply to the property before us--a partnership interest--in the light of the economic

similarities.  Both stock and partnership interests are ownership interests in

business entities; their value depends on the ability of the business entity to

generate and distribute profits.  Therefore, in determining whether MCMIM's

partnership interest in Companies was objectively worthless, we will consider

[*32] whether, in 2009, MCMIM's partnership interest ceased to have liquidating value and potential future value.

Petitioner asserts that MCMIM's partnership interest in Companies lacked both "liquidating value" and "potential value" by the end of 2009. Pointing to the priority of the project debt, the senior debt, and Holdings' preferred interest, petitioner argues that MCMIM's partnership interest was "hopelessly underwater" in 2009; all evidence indicated that it was extremely unlikely it would ever recover any value; and a set of "identifiable events" occurred in 2009 that demonstrated the worthlessness of the interest.

Respondent does not challenge the test for worthlessness generally but argues that it was not satisfied here. Respondent counters that the dire evidence shows only that Companies was "struggling financially" during 2009 and is insufficient to show worthlessness. Respondent also argues that petitioner failed to show that "all possibilities of eventual profit had 'effectively been destroyed.'"

    1. Lack of Liquidating Value

       a. Evidence Indicating No Liquidating Value

Under Morton v. Commissioner, 38 B.T.A. at 1278-1279, a taxpayer claiming a worthlessness loss deduction must show that its equity interest ceased to have liquidating value during the year in issue. Generally this may be shown by

[*33] an authoritative balance sheet showing liabilities in excess of assets, leaving no value for equity holders. Steadman v. Commissioner, 50 T.C. at 377; Morton v. Commissioner, 38 B.T.A. at 1282; Flint Indus., Inc. v. Commissioner, 2001 WL 1195725, at *17. Balance sheet insolvency at the entity level is not necessarily required when preferred equity interests are involved, however. A subordinate equity interest may become worthless if the company cannot satisfy a senior equity interest holder's preferential claim in liquidation. See Mahler v. Commissioner, 119 F.2d 869, 873 (2d Cir. 1941) (concluding that preferred stock and common stock of a corporation became worthless in different years); H.K. Porter Co. v. Commissioner, 87 T.C. 689, 694 (1986) (holding that the priority of indebtedness over preferred and common stock and of preferred stock over common stock must be respected); Spaulding Bakeries, Inc. v. Commissioner, 27 T.C. 684 (1957) (finding the taxpayer's common stock worthless because the corporation could not satisfy the claim of the taxpayer's preferred stock when the corporation dissolved and nothing was distributed on account of the common stock), aff'd, 252 F.2d 693 (2d Cir. 1958).

In Spaulding Bakeries, Inc. v. Commissioner, 27 T.C. at 685-686, the taxpayer owned common stock and all the outstanding preferred stock of a corporation. The shares of preferred stock were entitled to quarterly dividends,

**[*34]** and, on dissolution or liquidation of the corporation, the holders of preferred stock were entitled to receive the full par value of their preferred stock plus all accrued unpaid dividends before any payment whatsoever could be made upon the common stock of the corporation. Id. at 685. In 1950 the corporation dissolved, and all of its remaining assets were transferred to the taxpayer as holder of all of the outstanding preferred stock, but the amount transferred was less than the par value of the preferred stock. Id. at 686. Because the taxpayer did not receive full par value for the preferred stock and did not receive anything on account of its common stock, it claimed a worthless stock deduction for its common stock in 1950. Id. In recognizing the priority of preferred stock over common stock, we held that the common stock was worthless because the corporation could not satisfy the claim of the preferred stock and that the taxpayer was entitled to a loss deduction.[5] Id. at 688-689.

---

[5] The specific issue before the Court in Spaulding Bakeries, Inc. v. Commissioner, 27 T.C. 684 (1957), aff'd, 252 F.2d 693 (2d Cir. 1958), was whether the nonrecognition rule in sec. 112(b)(6) of the Internal Revenue Code of 1939, the predecessor to sec. 332, applied to bar the taxpayer, a corporation, from claiming the worthless stock deduction. That rule prevents a corporation from recognizing gain or loss upon receipt of property distributed in complete liquidation of another corporation, under certain circumstances. The Court had to decide whether the taxpayer received any property in liquidation of its common stock when the liquidating distribution the taxpayer received was insufficient to satisfy the claim of the preferred stock the taxpayer held. Id. at 687-688.

[*35] We are convinced that MCMIM would have received nothing in liquidation of its partnership interest had Companies liquidated at the end of 2009. Companies projected that it could generate only $51.6 million were it to force a disposition of all projects by the end of 2009 and immediately pay down the project debt to the extent possible. And the evidence regarding market conditions suggests that this projection may have been optimistic. As of the end of 2009 many project entities were still years away from fully developing their projects, and the market for residential real estate in the project markets was severely depressed as a result of the subprime mortgage crisis. Because an immediate fire sale in these conditions could have been catastrophic, Companies chose to wind down over five years.

At any rate, MCMIM presented sufficient evidence to support our conclusion that the $51.6 million in proceeds that Companies could generate in a hypothetical 2009 liquidation would fall short of satisfying the $70 million in outstanding senior debt. The senior lender agreed that the senior debt would not be fully repaid if there was a 2009 liquidation--indeed, the senior lender had taken cumulative impairments equal to 40% of the debt's value. And at that time Holdings' preferred interest and preferred return, which also were senior to MCMIM's partnership interest, exceeded $71 million. Thus, the evidence shows

[*36] that MCMIM's partnership interest in Companies was "under water" by a substantial margin in 2009, sitting behind both the senior debt and Holdings' preferred interest.

The fact that Companies' balance sheet for the year ending December 31, 2009, indicated that Companies was solvent does not change our conclusion that MCMIM's junior partnership interest in Companies had no value on liquidation. Companies reported assets (as a going concern) of $331,461,000, liabilities of $268,650,000, and members' equity of $62,811,000 as of the end of 2009. But as of the end of 2009 Holdings' preferred interest and accrued preferred return was over $71 million, exceeding members' equity by nearly $8.5 million. And Holdings would have been entitled to its preferred interest and preferred return before MCMIM received any liquidating distributions on account of its junior interest. See Mahler v. Commissioner, 119 F.2d at 873; H.K. Porter Co. v. Commissioner, 87 T.C. at 694; Spaulding Bakeries, Inc. v. Commissioner, 27 T.C. 684. As we held in Spaulding Bakeries, Inc., we recognize and give effect to the junior status of MCMIM's interest. Companies' balance sheet indicated that the value of its assets were insufficient to pay off all of Companies' liabilities and Holdings preferred interest and accrued preferred return as of the end of 2009. It

[*37] therefore supports our conclusion that MCMIM's interest had no liquidating value.

In short, none of respondent's arguments can overcome the fact that MCMIM held an interest that was junior to both a $70 million senior debt obligation and a preferred interest with an accrued preferred return that exceeded $71 million. And all of the economic data available to Companies, MCMIM, and other financial players indicated that under various scenarios MCMIM would recover nothing for its interest.

### b. MCMIM's Capital Account

Respondent argues nonetheless that MCMIM's partnership interest had some liquidating value in 2009. Specifically, respondent argues that MCMIM, as Companies' manager, could have "forced" a dissolution of Companies in 2009 and received a liquidating distribution under section 7.3 of the operating agreement, which stated in general terms that, upon dissolution, liquidating distributions are made in accordance with positive section 704(b) capital accounts. We disagree.

First and foremost, respondent cites no authority for the proposition that a positive capital account reported on a partner's Schedule K-1 precludes a finding that the partnership interest had no liquidating value. As we explained above, the evidence indicates that a liquidation in 2009 would not have generated enough

[*38] cash to pay off the senior debt, leaving nothing for equityholders--Holdings or MCMIM. And even if some assets remained, Holdings was entitled to priority in liquidation, and the evidence suggests that Holdings was highly unlikely to have received payment for its full preferred interest and cumulative preferred return had Companies dissolved in 2009.

We disagree with respondent's contention that Holdings did not have a liquidation preference under Companies' operating agreement. Pointing to section 7.3 of the operating agreement in isolation, respondent asserts that MCMIM would be entitled to liquidating distributions immediately after payment of debt. Section 7.3 of the operating agreement does provide for liquidating distributions in accordance with positive section 704(b) capital account balances, but after Holdings became a member, the members executed the eleventh amendment "to clarify" that MCMIM was subordinate to Holdings. That amendment confirms that Holdings had a liquidation preference. It states that "MCMIM shall not be entitled to <u>any</u> distributions" until Holdings has received its preferred interest and preferred return. (Emphasis added.) Read together with section 7.3 of the operating agreement, the eleventh amendment creates an additional condition precedent to MCMIM's receiving a liquidating distribution.

**[*39]** And the weight of the evidence supports our interpretation.[6] The parties intended that Holdings' preferred interest "mirror" its priority as subordinate debt, which would have entitled Holdings to repayment before MCMIM. The contracting parties' interpretation of the operating agreement is consistent with that intention, as evidenced by the testimony at trial and Companies' 2008 and 2009 audited financial statements, which state that Holdings had a "liquidation preference of $65.1 million". In sum, even if a hypothetical liquidation in 2009 could have generated enough cash to pay off the senior debt, MCMIM would not have been entitled to liquidating distributions until after Holdings had received its preferred interest and accrued preferred return, which was highly unlikely.

Respondent's argument fails in two other ways. First, the operating agreement provides for liquidating distributions in accordance with section 704(b) capital accounts. But the positive capital account balance reported on MCMIM's

---

[6] We find that the eleventh amendment, read together with section 7.3 of the operating agreement, is unambiguous. But even if the operating agreement was reasonably susceptible to multiple interpretations as to liquidating distributions, extrinsic evidence supports our interpretation. See Peco Foods, Inc. v. Commissioner, T.C. Memo. 2012-18, 2012 WL 129806, at *7 (applying relevant State law when a contract has a choice of law clause), aff'd, 522 F. App'x 840 (11th Cir. 2013); Minn. Invco of RSA No. 7, Inc. v. Midwest Wireless Holdings LLC, 903 A.2d 786, 794 (Del. Ch. 2006) (stating that if terms in a Delaware LLC agreement are clear and unambiguous, then courts must give the terms their plain meaning, but if the terms are ambiguous, the court may look to extrinsic evidence to determine the intent of the parties).

[*40] Schedule K-1 was its GAAP capital account, not its section 704(b) capital account. And the "0.39%" share of capital on item J of the Schedule K-1 was derived from the GAAP capital account. Because section 704(b) capital accounts can differ from GAAP capital accounts, the GAAP capital account reported on the Schedule K-1 does not necessarily reflect what liquidating distributions MCMIM would have been entitled to under section 7.3 of the operating agreement. See William S. McKee et al., Federal Taxation of Partnerships and Partners, para. 6.04, at 6-26 to 6-28 (4th ed. 2007).

Second, since dissolution or liquidation did not occur in 2009, any capital account balances as of the end of 2009 do not reflect any adjustments that would be required under section 704(b) had such a dissolution or liquidation occurred in 2009. Before Companies could make liquidating distributions (if any), it would be required to take into account all section 704(b) capital account adjustments for the tax year during which dissolution occurred. Petitioner argues that a dissolution and liquidation in 2009 would have required Companies to dispose of all of its assets and immediately recognize substantial losses, which would have been allocated to MCMIM, reducing its section 704(b) capital account to zero before any liquidating distributions could be made. We find this argument persuasive, particularly in the light of the poor business conditions discussed above and the

[*41] allocation provisions in the operating agreement. Thus, the GAAP capital account balance on MCMIM's 2009 Schedule K-1 is not an indication that MCMIM would have been entitled to anything had it forced Companies to liquidate in 2009.

### 2. Lack of Potential Future Value

Having determined that MCMIM's partnership interest in Companies had no liquidating value by the end of 2009, we must consider whether it also lacked potential future value then. See Morton v. Commissioner, 38 B.T.A. at 1278 (holding that the worthlessness of an equity interest depends "not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the * * * [company]"). An equity interest has potential future value when, despite the lack of liquidating value, there is still a "reasonable hope and expectation that * * * [the interest] will become valuable at some future time". Id.

The hope and expectation that an equity interest may become valuable in the future can be foreclosed when certain "identifiable events" occur in the company's life that effectively destroy the potential value. Steadman v. Commissioner, 50 T.C. at 376-377; Morton v. Commissioner, 38 B.T.A. at 1278. An "identifiable event" is "an incident or occurrence that points to or indicates a loss--an evidence

[*42] of a loss." Indus. Rayon Corp. v. Commissioner, 94 F.2d 383, 383-384 (6th Cir. 1938); see Webster v. Commissioner, 6 T.C. 1183, 1187 (1946). Identifiable events include, e.g., bankruptcy, the cessation of business, liquidation, or the appointment of a receiver. Steadman v. Commissioner, 50 T.C. at 376-377; Morton v. Commissioner, 38 B.T.A. at 1278. The evidence "may vary according to circumstances and conditions." Indus. Rayon Corp. v. Commissioner, 94 F.2d at 384. In some instances a taxpayer can demonstrate that its equity interest does not have potential future value, even in the absence of an identifiable event, if the company becomes hopelessly insolvent. Steadman v. Commissioner, 50 T.C. at 377; Morton v. Commissioner, 38 B.T.A. at 1279; Flint Indus., Inc. v. Commissioner, 2001 WL 1195725, at *19; Tejon Ranch Co. v. Commissioner, T.C. Memo. 1985-207, 49 T.C.M. (CCH) 1357, 1362 (holding that a partnership's hopeless insolvency justified a deduction for a worthless partnership investment under section 165).

Petitioner argues that MCMIM's partnership interest in Companies no longer had potential future value in 2009, citing a combination of identifiable events. Petitioner argues that worthlessness also is established because MCMIM's partnership interest became "hopelessly insolvent" in 2009.

**[*43]**                    a.  <u>Identifiable Events</u>

Petitioner first argues that the loss of potential future value in 2009 is evidenced by the following "identifiable events" within the meaning of section 1.165-1(b) and (d)(1), Income Tax Regs.:  (1) the significant decline in the cashflow from Companies' projects; (2) the decision by Companies' owners to wind down Companies and dispose of its projects; (3) the decision by the San Miguel project debt lender to settle with the SCEs for a $2 million cash payment after foreclosure and the decision by the Sunnyside project lender to release the SCEs from their guarantor liability; (4) Companies' inability to attract equity investment and external investors' insistence that any new equity be invested in MREG; (5) Ernst & Young's going concern opinions; (6) the nine notices of default issued to Companies in 2009; (7) the new limitations placed on Companies under the senior debt agreement; and (8) the severe recession as a result of the subprime mortgage crisis.  Petitioner adds that, on the basis of these events, the senior lender concluded that its debt was worth only 60% of its face value by the end of 2009, taking impairment charges to reflect this assessment.

We find that several identifiable events confirm that MCMIM's partnership interest in Companies lacked any potential future value by the end of 2009.  First, the financial crisis and resulting recession beginning in 2007 and continuing in

[*44] 2009 had a devastating impact on the residential housing markets in which Companies' projects were being developed. Companies' revenue decreased from $824 million in 2005 to $255 million in 2009. Companies recorded impairment losses beginning in 2007, including an $88.6 million impairment loss attributable to wholly owned and joint venture assets. Some project lenders stopped funding loans, and Companies was unsuccessful in attracting additional equity investment. These events caused Companies to struggle to comply with its various financial covenants under the senior debt and project debt loan documents. We thus conclude that the severe recession caused by the subprime mortgage crisis that adversely affected the potential future value of Companies and its projects is an identifiable event. See Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 596 (1991) ("[T]he collapse of the offshore oil rig supply industry leading to the loss in value of the vessels is a sufficiently identifiable set of circumstances to explain the worthlessness of the subordinated note.").

Second, the financial statements audited by Ernst & Young depicted the dire financial condition of Companies in 2008 and 2009. Ernst & Young doubted Companies' ability to function as a going concern, and Companies' audited financial statements reflected continued large operating losses. These "big red flags" for management and lenders also are illustrative of how the cumulative

[*45] events affecting Companies and its project entities "fixed" the loss of MCMIM's investment in Companies by the end of 2009. See Mahler v. Commissioner, 119 F.2d at 873 (noting that a report can have evidentiary force as an identifiable event proving worthlessness).

Third, Companies' cashflow forecasts reflected a significant decline in expected cashflow from operations and support a conclusion that MCMIM's junior partnership interest had no potential future value by the end of 2009. As the real estate market deteriorated and Companies' financial condition worsened, cashflow projections predictably became more pessimistic. The January 2009 cashflow forecast showed that Companies would end with a cash balance of $63,684,000 if it were able to wind down all projects successfully through 2016 and pay its debt. But by December 2009, after Companies lost or terminated certain projects, the updated cashflow forecast projected that it would have an ending cash balance of only $12.3 million if it were able to wind down its projects successfully by the end of 2014 and pay its debt. The December 2009 forecast projected that Companies would not generate sufficient cash during its winddown to make required principal payments on the senior debt in 2012 and 2013. We therefore conclude that the December 2009 cashflow forecast was another

[*46] identifiable event indicating to MCMIM that its junior partnership interest had lost any potential future value.

Fourth, we find that Companies' owners' decision in 2009 to wind down the entity over five years is an identifiable event fixing MCMIM's loss. The orderly winddown plan, while not memorialized, was agreed upon by Companies' owners and implemented by its management. And we accept their explanation that memorializing it might have spread the bad news, hampering winddown efforts.

Because MCMIM and the SCEs remained guarantors of the project debt, they had an interest in building out Companies' projects and maximizing asset values for the benefit of creditors. An immediate liquidation would have meant a fire sale of unfinished real estate projects in a very unfavorable market--a disaster scenario for these guarantors. The decision to wind down over five years is similar to some of the more traditional identifiable events described by early cases, such as bankruptcy, liquidation, the appointment of a receiver, or the cessation of normal business operations. Steadman v. Commissioner, 50 T.C. at 376-377 (including appointment of a receiver, cessation of normal business operations, bankruptcy, and liquidation as examples of identifiable events); Morton v. Commissioner, 38 B.T.A. at 1278 (noting that identifiable events are "called 'identifiable' in that they are likely to be immediately known by everyone having

[*47] an interest by way of stockholdings or otherwise in the affairs of the corporation").

Respondent argues that Companies' continued operations during 2009 and the winddown period indicate that MCMIM's partnership interest must have had some potential future value. We disagree. The continued operation of a company beyond the year of claimed worthlessness does not itself prove future value in its equity interests. See Steadman v. Commissioner, 50 T.C. at 378; Rand v. Commissioner, 40 B.T.A. 233, 240 (1939), aff'd, 116 F.2d 929 (8th Cir. 1941); Frazier v. Commissioner, T.C. Memo. 1975-220, 34 T.C.M. (CCH) 951, 966 (1975). And taxpayers have shown that their interest in a partnership is worthless in a year where the partnership did not cease its operations. See Echols I, 935 F.2d 703; Tejon Ranch Co. v. Commissioner, 49 T.C.M. (CCH) at 1362. In Frazier v. Commissioner, 34 T.C.M. (CCH) at 962-963, we observed that in cases involving continued operation of a company beyond the year of claimed worthlessness,

> [o]ur examination centers around whether the activities pursued
> during and after * * * [the year of claimed worthlessness] were in the
> nature of an attempt to salvage something for creditors, * * * or
> whether such activities were so related to a continuation of general
> operations that they manifest reasonable expectations of future value
> in the * * * [equity]. * * *

**[\*48]** There, we rejected the notion that continued operations in 1970 precluded a worthless stock deduction for 1969 because the corporation's declining gross revenue shown on its income statements for 1969 and 1970 indicated that the corporation had adopted a plan of termination in 1969 and reflected a concerted effort to implement that plan. Id. Here, Companies' operating revenue decreased approximately 35% in 2010 compared to 2009, supporting the testimony that Companies was actively working to wind down. Companies' operations during the winddown were aimed at maximizing value for the project debt lenders and the senior lender. In sum, the end of Companies was inevitable in 2009 when its owners decided to wind down and that decision finally destroyed any expectation that MCMIM might recover any value on account of its junior partnership interest.

Lastly, the 2009 defaults on project debt and subsequent foreclosures support a finding of worthlessness in 2009. Indeed, the senior lender could have decided to declare a default on the senior debt because of cross-default provisions at that time. And as noted above, immediate payment of the senior debt would have left nothing for MCMIM.

Again, respondent does not take issue with the test to be applied. Instead respondent argues that the facts here do not satisfy it. Respondent argues that the events described above do not establish that all possibilities of eventual profit had

**[*49]** been effectively destroyed, citing Nelson, 131 F.2d 301, and Tejon Ranch

Co. v. Commissioner, T.C. Memo. 1985-207.

In Nelson, 131 F.2d at 303, the taxpayer held common stock in a

corporation that was engaged in the investment banking business. In late 1931

panic in the securities market caused the market for the securities the corporation

held, some of which it had originated or purchased at wholesale, to decline

severely in value. The corporation continued to buy and sell securities on the

market from 1932 to 1935 and continued to work to realize as much as possible

for the securities it held as of the end of 1931. Id. It realized a net profit from

1932 to 1935 on securities it bought and sold during these years, but because of

high leverage, the balance sheet reflected a deficit in shareholders' equity in each

of those years. In late 1935 the corporation was forced by its lenders to liquidate,

and the taxpayer claimed a worthless stock deduction for that year. Id. The U.S.

District Court for the District of Minnesota concluded that the taxpayer's loss

must have occurred before 1935 because identifiable events occurred before

liquidation in 1935, including the financial crisis that began in October 1929, the

subsequent inability of the corporation to find a market for its securities at

anywhere near its cost, its large indebtedness to banks, the discontinuance of its

[*50] investment banking business in 1932, and a bank holiday in the country in March 1933.  Id. at 304.

In reversing the District Court, the Court of Appeals for the Eighth Circuit held that the taxpayer's stock was worthless in 1935, the year claimed.  Id. at 303.  The Court of Appeals noted that the test for worthlessness is a "practical, not a legal, test", and that taxpayers should not be held to "hard and fast technical rules" in determining the precise time in which their loss occurred.  Id. at 302 (quoting Lucas, 280 U.S. at 449).  And while some identifiable event must occur in the year of the loss, which may be a single event or a series of events, the presence of identifiable events in earlier years is not "decisive upon the question of the worthlessness of stock where the evidence also establishes the existence of a potential value which may be realized on liquidation or through continuation of business."  Id. at 303.  The Court of Appeals concluded that the District Court had erred in determining that the loss occurred in a year before 1935 because the evidence established that, despite the presence of one or more identifiable events in earlier years, the stock had potential value that could have been realized.  Critical to its conclusion was the testimony of two experienced investment bankers, uncontradicted in the record, that the stock continued to have potential value and did not actually become worthless until liquidation of the corporation in

[*51] 1935. Both witnesses testified that the market for the corporation's securities was only temporarily depressed beginning in 1929, that it steadily improved from 1932 to 1935, and that, absent forced liquidation by the corporation's lenders in 1935, the corporation's stockholders would have eventually been able to realize a substantial, if not full, return on the value of their investments. Nelson, 131 F.2d at 303-304.

Nelson, 131 F.2d at 304-305, is consistent with our conclusion in this case. The Court of Appeals in Nelson simply concluded that the taxpayer's loss occurred in the year in which the taxpayer believed that its stock was worthless, as confirmed by an identifiable event occurring in that year. While the corporation's liquidation was the identifiable event that ultimately supported the taxpayer's worthlessness loss deduction, the Court of Appeals did not hold that a company's liquidation is a prerequisite to a worthlessness loss deduction. Nelson thus confirms that the presence of certain identifiable events is not necessarily decisive on the question of worthlessness when there also is evidence that the stock has potential value that may be realized. Here, no such evidence establishes that MCMIM's interest in Companies had potential value in the years in which the identifiable events occurred. Unlike the record in Nelson, the record in this case does not contain testimony of investment bankers that, notwithstanding the

[*52] identifiable events in 2009, MCMIM's partnership interest still had potential value at the end of 2009. To the contrary, the testimony in this case--including the testimony of a banker working for the senior lender--confirms that MCMIM's interest lost any potential value by the end of 2009.

Respondent's reliance on Tejon Ranch Co. v. Commissioner, 49 T.C.M. (CCH) at 1362, is equally misplaced. First, the case undermines respondent's position that MCMIM could not lose the hope and expectation of future value in its interest until Companies liquidated. There, the taxpayer's loss with respect to its limited partnership interest occurred in a year (1978) where the limited partnership "did not go into formal bankruptcy, liquidation, or dissolution" because it was "clear that * * * [the partnership] was insolvent beyond any hope of rehabilitation by the end of 1978." Id. at 1364. Second, the holding that the taxpayer's partnership interest did not become worthless in either 1976 or 1977-- despite negative events occurring in those years to the partnership--was based on evidence that the partnership interest still had potential future value during those years. Id. Specifically, the partnership had not defaulted on any of its debt as of 1977, and a 1977 report from a financial consulting company engaged by the partnership stated that even with the financial problems facing it, the partnership would be able to repay its debts in future years if prices and yields on crops

**[\*53]** became favorable and if the partnership sold some of its properties and secured additional financing. Id. By contrast, in this case, as of the end of 2009 there were several defaults on project debt, and all indications were that Companies would struggle to pay off its senior debt, let alone satisfy Holdings' preferred interest and accrued preferred return.

In sum, Nelson and Tejon Ranch Co. illustrate the fact-intensive nature of fixing the year of an equityholder's worthlessness loss when a company declines over several years. On the record before us, respondent could only criticize each identifiable event in isolation, arguing that each alone might not be sufficient; he could not and did not direct us to affirmative evidence showing how MCMIM's partnership interest in Companies continued to have potential future value. We find that the identifiable events together confirm that the likelihood of potential future value was minimal.

### b. Hopeless Insolvency

Alternatively, petitioner argues that MCMIM's junior partnership interest in Companies was worthless because it was "hopelessly underwater", analogizing to the exceptional situations where a taxpayer can prove a lack of potential value without showing an identifiable event. Steadman v. Commissioner, 50 T.C. at 377; Morton v. Commissioner, 38 B.T.A. at 1279. We need not decide the issue

**[*54]** because we found above that identifiable events in 2009 show that MCMIM's partnership interest ceased to have potential future value in 2009.

### c. Foreclosure Requirement

Respondent asserts that MCMIM's partnership interest had potential future value until foreclosure occurred with respect to each real property interest encumbered by a recourse mortgage held by Companies' project entities, citing Tucker v. Commissioner, T.C. Memo. 2015-185. There, we held that real property held by a taxpayer's S corporation did not become worthless before a foreclosure sale occurred because the real property was encumbered by recourse debt. Id. at *10-*15. The S corporation, Paragon, owned real estate for development. The real estate served as collateral for a number of recourse mortgage loans. When the real estate market declined in 2007 and 2008, Paragon went underwater on many of its recourse mortgages, and it wrote down the value of its real estate holdings in 2008 as a result, arguing that they had become worthless. We explained our holding as follows:

> Paragon was personally liable for the mortgage loans regardless of whether it could pay. This meant that the banks could go after Paragon for the remainder of the debt if the proceeds from foreclosure were inadequate to cover Paragon's debt obligations. Even so, a taxpayer's equity in mortgaged property for which the taxpayer is personally liable is not worthless before a foreclosure sale because "the property continues * * * to have some value which, when

**[\*55]** determined by the sale, bears directly upon the extent of the owner's liability for a deficiency judgment."  Therefore, Paragon's properties continued to have value before their respective foreclosure sales in 2009 and 2010 even if, as petitioner claims, Paragon had no additional funds to reimburse its lenders.

Id. at \*14 (citations omitted).

Tucker does not preclude a finding of worthlessness in this case.  In Tucker, the Court considered the worthlessness of the underlying real property, not the taxpayer's equity interest in Paragon, the entity that held the real property.  At issue here, by contrast, is the worthlessness of the partnership interest itself, not any particular asset the partnership held.  See Echols I, 935 F.2d at 707 ("Emphasizing again that the asset being tested for worthlessness is not the Land but the Taxpayers' 75% interest in the Partnership which owned the Land, we must determine subjectively just when it was that the Taxpayers deemed their Partnership interest worthless, then determine objectively whether that interest was valueless at such time.").

A taxpayer asserting that its equity interest in a company is worthless need not prove that every asset that the company holds is worthless.  Steadman v. Commissioner, 50 T.C. at 378 (holding that corporate stock was worthless even though the corporation held valuable assets because the taxpayer proved that corporate stock had no liquidating or potential future value); Tejon Ranch Co. v.

[*56] Commissioner, 49 T.C.M. (CCH) at 1362 (holding that a partnership interest became worthless when the partnership became insolvent beyond hope of rehabilitation). Therefore, a taxpayer holding a worthless partnership interest need not delay deducting a loss under section 165(a) merely because the partnership owns real estate interests encumbered by recourse debt.

### d. Lack of Expert Valuation

Respondent also argues that petitioner has not shown that MCMIM's partnership interest in Companies was worthless because petitioner did not call an expert witness. In respondent's view, determining whether MCMIM's partnership interest had liquidating value or potential future value requires expert valuation.

Expert testimony can be helpful, and it may be an important consideration in some cases. See, e.g., Steadman v. Commissioner, 50 T.C. at 377 (noting that uncontroverted expert testimony that stock was worthless in a given year supported taxpayer's worthless stock deduction); Flint Indus., Inc. v. Commissioner, 2001 WL 1195725, at *19 (noting that the Commissioner would have been wise to present affirmative evidence to rebut the taxpayer's expert testimony that stock was worthless in the year claimed). But expert testimony is not necessary to show worthlessness for purposes of section 165. See, e.g., Echols I, 935 F.2d 703 (determining that the taxpayer's partnership interest was

[*57] worthless without expert testimony); <u>Oak Harbor Freight Lines, Inc. v. Commissioner</u>, T.C. Memo. 1999-291 (determining that the taxpayer's intrastate operating authorities were worthless without expert testimony); <u>Tejon Ranch Co. v. Commissioner</u>, T.C. Memo. 1985-207 (determining without expert testimony that the taxpayer's partnership interest was worthless).

Respondent did not cite any authority holding that expert valuation is <u>required</u> to prove worthlessness under section 165. Of the three cases respondent cites none involves deductions for worthlessness losses under section 165. In <u>CSX Transp., Inc. v. Ga. State Bd. of Equalization</u>, 552 U.S. 9 (2007), the issue was whether State taxpayers could challenge, under the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94-210, 90 Stat. 31, a State's valuation method when valuing railroad properties for ad valorem tax purposes. And both <u>Thompson v. Commissioner</u>, 499 F.3d 129 (2d Cir. 2007), <u>vacating and remanding</u> T.C. Memo. 2004-174, and <u>Silverman v. Commissioner</u>, 538 F.2d 927 (2d Cir. 1976), <u>aff'g</u> T.C. Memo. 1974-285, involved valuation for estate or gift tax purposes. These cases did not consider whether a partnership interest was worthless, nor do they stand for the proposition that the Court cannot determine the value of property (or the absence thereof) without expert testimony. To the contrary we have said that "the taxpayer need not be forced to hire valuation

[*58] experts where, as here, his own testimony is credible and founded upon reasonable factual premises." Holmes v. Commissioner, 57 T.C. 430, 439 (1971). And even if there had been expert testimony in this case, the cases respondent cites make plain that we are "not bound by the formulas or opinions proffered by expert witnesses" and we "may reach a determination of value based upon * * * [our] own analysis of all the evidence in the record." Thompson v. Commissioner, 499 F.3d at 133 (quoting Silverman v. Commissioner, 538 F.2d at 933). As we have explained above, we determined that MCMIM's interest in Companies had no liquidating value or potential future value on the basis of our own analysis of all the evidence in the record.

C. Loss Is Bona Fide

Respondent also argues that MCMIM's loss was not bona fide within the meaning of the regulations. Citing Scully v. United States, 840 F.2d 478, 485 (7th Cir. 1988) (quoting 7 Jacob Mertens, Law of Federal Taxation, sec. 28.26 (1980)), for the general proposition that a taxpayer may not "transfer assets from one pocket to another and take a loss thereby where he remains at the conclusion of the transfer the real owner of the property", respondent argues that MCMIM should not be able to claim a loss deduction because the McMillin children remained beneficial owners of Companies both before and after MCMIM's partnership

[*59] interest became worthless and therefore they "experienced no loss at all." Respondent also broadly urges us to scrutinize the transactions and dealings of the McMillin entities closely because they involve related parties.

Respondent failed to demonstrate that the transactions between the McMillan entities should not be respected for tax purposes. See Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978) ("[W]here * * * there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties."); see also Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990) (applying a two-part test that considers whether the taxpayer subjectively had a nontax business purpose and whether the transaction objectively had economic substance (citing Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), aff'g T.C. Memo. 1986-23)), aff'g in part, rev'g in part Larsen v. Commissioner, 89 T.C. 1229 (1987), and aff'g Casebeer v. Commissioner, T.C. Memo. 1987-628, Moore v. Commissioner, T.C. Memo. 1987-627, and Strum v. Commissioner, T.C. Memo. 1987-625.

**[*60]** First, respondent objects that Companies did not itself acquire the subordinate debt at a discount. But that was beyond its control because the senior lender would not permit it. Instead the McMillin children formed Holdings to invest new capital in Companies by acquiring the subordinate debt from an unrelated lender. Moreover, Companies and its owners wanted an affiliate to purchase the debt because it ensured that a third-party owner of the debt--such as a distressed debt purchaser--would not push Companies into bankruptcy. Holdings later converted the subordinated debt to equity for a legitimate business reason: to revive Companies' balance sheet by reversing its negative net worth, thus enabling Companies to satisfy its minimum net-worth covenant and put it in a better position in restructuring negotiations with the senior lender. The debt-to-equity conversion had economic substance for the parties: Companies shed significant debt and the risk profile of Holdings' investment fundamentally changed when it traded various creditor's rights and priorities for higher upside.

Second, respondent argues that MCMIM and Holdings were two pockets of the same pair of pants. We reject that analogy. The McMillin entities were separate legal entities. Respondent has not challenged their separate existence; indeed, he emphasized in his brief that "[w]hether the McMillin family entities are recognized as separate entities is not an issue in this case." The ownership of

[*61] these entities was not identical because Vonnie's trust owned an interest in MCMIM but chose not to invest in M3 and Holdings.

Respondent also failed to identify any actual "transfer" from MCMIM to Holdings, unlike Scully, where a set of family trusts sold some real estate at a loss to another set of family trusts that had the same beneficiaries. Scully, 840 F.2d at 486 ("[T]he purpose of the sale was to keep all the real estate in the family and to permit the trustees to operate the land in both sets of trusts as a single, integrated economic entity."). Among the transactions involving Holdings, the only "transfer" was Companies' contribution of approximately $3.9 million-- which possibly, but not necessarily, came from MCMIM's capital contributions-- towards the acquisition of the subordinate debt. Companies received a membership interest in M3 (which owned Holdings) in exchange, so Companies not only received value but also shared in the upside of the discounted purchase of the debt. That is, Companies invested $3.9 million for the possibility of receiving upwards of $15 million (possibly more if Companies were able to recover from the damaged state it was in at the end of 2008). Respondent asks us to engage in a hypothetical and assume away the reality that faced Companies here. And respondent identified no tax considerations that would swamp the economic reality here. The record amply illustrates that nontax considerations drove the

**[\*62]** decision to restructure the debt. And if the debt instead were held by an unrelated third party in 2009 or during the winddown period, there would be no dispute that MCMIM's interest was under water.

We hold, therefore, that MCMIM is entitled to deduct its section 165(a) loss with respect to its worthless partnership interest in Companies for the tax year in issue.

III.  Section 6662(a) Penalty

Section 6662(a) and (b)(1) and (2) imposes a penalty equal to 20% of the portion of an underpayment of tax required to be shown on the return that is attributable to "[n]egligence or disregard of rules or regulations" and/or a "substantial understatement of income tax."

As we have determined no adjustments to MCMIM's return that could result in an underpayment for the tax year in issue, there can be no penalty.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

**[*63]** To reflect the foregoing,

<u>An appropriate order will be issued, and decision will be entered for petitioner</u>.